**Julie MEINDERS, Plaintiff,**

v.

**Jo Anne B. BARNHART,[1] Acting Commissioner of Social Security, Defendant.**

**No. 4:01–CV–90476.**

United States District Court,
S.D. Iowa,
Central Division.

April 17, 2002.

---

1. Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Gregory W. Peterson, Des Moines, IA, for Plaintiff.

Willaim C. Purdy, Asst. U.S. Atty., Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Julie Meinders, filed a Complaint in this Court on August 7, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is affirmed in part and reversed in part.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on January 14, 1997, claiming to be disabled since August 16, 1961. Tr. at 119A–119C & 231–34. After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge John P. Johnson (ALJ) on September 30, 1998. Tr. at 51–103. The ALJ issued a Notice Of Decision—Unfavorable on December 19, 1998.

Tr. at 11–45. After the decision was affirmed by the Appeals Council on June 21, 2001, (Tr. at 5–6), Plaintiff filed a Complaint in this Court on August 7, 2001.

## MEDICAL EVIDENCE

When Plaintiff was 14 years old, she was admitted to Clarinda Mental Health Institute on March 5, 1975 and discharged September 8, 1975. Plaintiff was admitted because she was uncontrollable by her mother and had been having difficulty with school and running away from home. The admission, as well as discharge, diagnoses were runaway reaction of adolescence and adjustment reaction of adolescence. Tr. at 166–67. On June 15, 1975, Plaintiff left the hospital and was not heard from again until it was determined that she had returned home and was living with her mother. Because neither Plaintiff nor her mother were interested in further services, Plaintiff was discharged from care. Condition on discharge was "unimproved." Tr. at 167. During the hospitalization, Plaintiff underwent a psychological evaluation which was conducted over a three-day period. On the Wechsler Adult Intelligence Scale (WAIS R), Plaintiff's scored 106 in verbal, performance and full scale IQ. Tr. at 168. The Rorschach test suggested to the psychologist that the WAIS–R provided an underestimation of Plaintiff's intelligence which was probably between 110 and 119. Tr. at 168–69. The Bender–Gestalt Test did not show evidence of an organic brain disease. Tr. at 169.

In a report dated March 7, 1997 (Tr. at 200–01), Michael L. Hopkins, Ed.D. wrote that Plaintiff had been referred to Two Rivers Psychological Services at the request of her family physician, Dr. Allen in Perry, Iowa who suspected Attention Deficit Disorder (ADD). She was initially seen February 10, 1996. Plaintiff received therapy at Two Rivers through March 27, 1996. Dr. Hopkins said that in his opinion

Plaintiff's psychological status was Attention Deficit Hyperactivity Disorder (ADHD) and Generalized Anxiety Disorder. Plaintiff had self medicated with alcohol and street drugs as a teenager, but had quit fifteen years prior to the evaluation. Dr. Hopkins reported that Plaintiff's performance on the Trail Making A and Trail Making B from the Halstead Reitan Neuropsychological Test Battery were both in the clinically impaired range. According to Dr. Hopkins, Dr. Allen had prescribed Diderix to help Plaintiff lose weight but noticed that the medication increased her concentration and focusing, and decreased her distractibility. Tr. at 200. Dr. Hopkins wrote: "It is this examiner's opinion that Julie's social history, ADHD symptoms, and Generalized Anxiety have inhibited her ability to function in a competitive work environment." Tr. at 201.

Plaintiff saw Kim Countryman, D.O. on April 19, 1996 for ADD and a general anxiety disorder. Plaintiff also complained of a sinus infection. Dr. Countryman renewed a prescription for Didrex. On May 13, 1996, Dr. Countryman changed the prescription of Didrex to Ritalin. Dr. Countryman wrote that Plaintiff was to see a psychiatrist on May 21, 1996. Tr. at 187. On May 22, 1996, the doctor renewed the prescription of Didrex and gave Plaintiff a prescription of Valium. On June 24, 1996, Dr. Countryman and Plaintiff discussed a future trial of Lithium which Plaintiff said she would consider. Tr. 186.

Plaintiff was seen at Dallas County Hospital, Convenience Clinic on July 3, 1996 because of anxiety, inability to sleep and depressed mood. Syed Shah, M.D. noted that Plaintiff had tried Prozac, Zoloft, Paxil and Imipramine without any reasonable response. Plaintiff reported that she had been told that she had ADD. Dr. Shah's diagnoses were panic attack, depressed

mood, and insomnia. The doctor prescribed Xanax and Desyrel. Tr. at 176.

Plaintiff saw Dr. Countryman on December 4, 1996, at which time the doctor wrote that Plaintiff was "doing wonderful" regarding her ADD. On February 3, 1997, Dr. Countryman adjusted the dosage of Didrex and prescribed Klonopin. Tr. at 185.

Dr. Countryman referred Plaintiff to Eyerly Ball Community Mental Health Services where she was seen the first time on November 4, 1996 by Steve Schulte, MSW, LISW, Clinical Social Worker. Tr. at 194–99. In addition to ADD, Plaintiff reported difficulty with anxiety, self esteem, memory, and task completion. Tr. at 194. Plaintiff said that her husband, who she described as verbally abusive, recently agreed to a divorce. Plaintiff and her husband had no children, although Plaintiff was the mother of two children from previous relationships. Plaintiff said that she had been in and out of therapy since age 11 when she was seen at West Central Mental Health Center. She said she was 11 or 12 when she was hospitalized in Clarinda. From age 14 to 16, Plaintiff was at the State Juvenile Home in Mitchelville. She also reported being in group homes as a child. Tr. at 197. After a mental status examination (Tr. at 198), Mr. Schulte diagnosed Attention Deficit Hyperactivity Disorder (ADHD), predominantly inattentive type. Tr. at 199.

Plaintiff was referred to Rachel Heiss, Ph.D. by Disability Determination Services on March 31, 1997. Tr. at 203–07. Dr. Heiss observed: Plaintiff "had so much trouble expressing her thoughts that the interview was very difficult. She could not answer questions about her personal history. She would say a few words, stop, and then start to say something else, never finishing her thought. It appeared she could not organize her thoughts well enough to express what she wanted to say." Tr. at 203. Plaintiff told Dr. Heiss that she had been trying to find out what was wrong with her for years until Dr. Hopkins diagnosed ADD. Her relationship with Dr. Hopkins, however, came to an end after she refused to take the drug Risperdal. Plaintiff reported trouble sleeping and said that she often wakes at 4:00 a.m., but that she has trouble getting out of bed. Tr. at 204. Dr. Heiss wrote that Plaintiff presented a confusing clinical picture because testing on the Wechsler Memory Scale–Revised, on which she scored an Attention/Concentration score of 113, did not support an ADHD diagnosis. Nevertheless, Dr. Heiss observed "substantial cognitive interference," although the source was not clear. "[Plaintiff] had such trouble expressing her thoughts, and her answers were so confusing that there still are many unanswered issues. She appears to have latched on to the ADD diagnosis because she wants an explanation for her confusion and inability to organize her life." Tr. at 206. The psychologist stated that Plaintiff's problems may be caused by emotional problems such as anxiety, depression or a personality disorder, but that the procedures of her evaluation were not sufficient to make a more definite diagnosis. Dr. Heiss opined that while Plaintiff has the intellectual ability to remember and carry out basic and detailed instructions, she would have trouble functioning when her anxiety level is high at which time she appears to shut down. "Pace and concentration would vary according to her anxiety level and emotional state." The doctor noted that Plaintiff's history suggests difficulty interacting appropriately with people and that her insight and judgment are poor. "Her tendency to become disorganized by her anxiety would hinder her ability to respond appropriately to change in the work place." Tr. at 207.

On a Psychiatric Review Technique Form (PRTF') (Tr. at 208–16), John F. Tedesco, Ph.D., a clinical psychologist who reviewed the records and reports for Disability Determination Services opined that while Plaintiff does not meet the requirements of any of the impairments listed in the Regulations, she would often have deficiencies of concentration, persistence or pace resulting in failure to completed tasks in a timely manner. Tr. at 213. On a Mental Residual Functional Capacity Assessment Form (Tr. at 217–20), Dr. Tedesco opined that Plaintiff is moderately limited in the following areas: The ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and, the ability to accept instructions and respond appropriately to criticism from supervisors. Tr. at 217–18.

Plaintiff saw Hector W. Cavallin, M.D. for an initial intake interview on May 8, 1997. Although Dr. Cavallin diagnosed ADD with hyperactivity, he wrote that Plaintiff's symptoms were somewhat of a combination of ADD and Obsessive Compulsive Disorder (OCD). Tr. at 221.

Plaintiff saw Mark Preston, M.D. on June 11, 1997. Tr. at 222–23. Dr. Preston stated that Plaintiff referred herself to him because she was not satisfied that her other doctors are knowledgeable regarding ADD. Tr. at 222. At the hearing, Plaintiff explained that she had made appointments with both Dr. Cavallin, and Dr. Preston at the same time. Rather than cancel one of the appointments and take the chance of not having a doctor, she kept both appointments. She only saw Dr. Preston on a couple of occasions. Tr. at 82. Dr. Pres-ton opined that in addition to ADD, Plaintiff's also has some panic attacks and that she is generally anxious. Tr. at 222–23. When Plaintiff was seen on July 2, 1997, she was tearful, anxious and tense but the doctor noted that her thoughts were well-organized and that her sensorium was clear. The doctor's impression was anxiety and depression not otherwise specified. Tr. at 224.

Dr. Cavallin wrote a report after his examination of Plaintiff on October 6, 1998. Tr. at 227–28. Dr. Cavallin said that Plaintiff's speech was clear but that her thinking was confused, confusing, and unfocused. Plaintiff's attention span was "markedly restricted." The doctor opined: "She has a thought disorder, it is very difficult for her to explain herself or to stay on any one subject. She is impulsive, does not think about the consequences of her behavior and seems unable to control her behavior." Tr. at 227. Dr. Cavallin stated that although Plaintiff suffers from severe anxiety and depression, it was his opinion that the most appropriate diagnosis was a personality disorder. "This is characterized by an inflexible maladaptive personality traits which cause significant impairment in social and occupational functioning as evidence by marked oddities of thought, perception, speech and behavior, persistent disturbance of mood or affect, pathological dependence and intense and unstable interpersonal relationships and impulsive and damaging behavior." In addition, the doctor said that Plaintiff has co-morbid diagnosis of ADD and generalized anxiety disorder. The doctor wrote:

Because of the above she has a markedly limited capacity to carry out instructions, maintain attention and concentration, to perform activities within a schedule, maintain regular attendance or to sustain an ordinary routine without special supervision, to work in coordina-

tion with others, or to make simple work-related decisions.

Social interaction is markedly restricted because she lacks the ability to interact appropriately with the general public, the ability to ask simple questions or request assistance, the ability to accept instructions and respond appropriately to peer decisions or supervisors, the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness.

Finally, the doctor wrote that Plaintiff's condition is chronic and not expected to improve. Tr. at 228.

## ADMINISTRATIVE HEARING

Plaintiff appeared at a hearing on September 30, 1998. The transcript of the entire hearing was reviewed by the Court. No probative value is seen in summarizing all of Plaintiff's testimony. One Item of particular note, however, is that Plaintiff testified that she saw Dr. Cavallin on numerous occasions for treatment, especially when she felt she was under particular stress. Tr. at 74.

After Plaintiff had testified, the ALJ called Roger Marquardt to testify as a vocational expert. Tr. at 93. The ALJ asked the following hypothetical question:

The first assumption is that we have an individual who was, who was 37 years old. She was 20 years old as of her date last insured for Title II benefits and she is a female. She has a high school education and past relevant work as has been defined in Exhibit 11–E (Tr. at 165), and she has the following impairments. She has a history of attention deficit hyperactive disorder, generalized anxiety disorder with history of panic attacks, history of obsessive-compulsive disorder and depression and as a result of a combination of those impairments she has the residual functional capacity as follows. She is able to do only simple, routine, repetitive work which does not involve the use of independent judgement for decision making, does not require constant attention to detail. This individual should have no more than occasional contact with the public. She does require occasional supervision. She should not work at more than a regular pace and that's using three speeds of pace from fast, regular and slow and she should not work at more than a mild to moderate level of stress. Would this individual be able to perform any job she previously worked at either as she performed it or as that job is generally performed within the national economy, and if so would you please specify which jobs?

Tr. at 98. In response, the vocational expert testified that Plaintiff would be able to return to her past relevant work and that other unskilled work would be possible. Tr. at 98–100. The vocational expert also testified that if Plaintiff is unable to show up for work on a regular basis, the cited jobs would be precluded. Tr. at 100. In response to a question from Plaintiff's representative, the vocational expert testified that work would be precluded if the hypothetical person often had deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner. Tr. at 101.

## ALJ'S DECISION

In his decision dated December 19, 1998, the ALJ found that prior to the expiration of Plaintiff's insured status on June 30, 1982, Plaintiff did not have a severe impairment and, therefore, her claim for Title II benefits was denied at the second step of the sequential evaluation. Tr. at 23.

The ALJ also found that Plaintiff had not engaged in substantial gainful activity after January 14, 1997, the date of her application for Title XVI benefits. The

ALJ found Plaintiff's severe impairments are a history of an attention deficit hyperactivity disorder, generalized anxiety with a history of panic attacks, a history of an obsessive-compulsive disorder, and depression. The ALJ found that none of Plaintiff's impairments were severe enough to meet the requirements of one listed in Appendix 1, Subpart P, Regulations No. 4. At the fourth step of the sequential evaluation, the ALJ found that Plaintiff is able to do her work as a sorter at a brickyard, house cleaner and day worker. In this regard, the ALJ found Plaintiff has a residual functional capacity consistent with his hypothetical question to the vocational expert. The ALJ also found that Plaintiff's allegations are inconsistent with the record and could only be given little weight. Tr. at 24. The ALJ held that Plaintiff is not disabled or entitled to the benefits for which she applied. Tr. at 25.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater*, 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater*, 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel*, 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

■ The ALJ found that during the time that Plaintiff was insured to receive Title II disability benefits she did not have a severe impairment. Subsequent medical, psychological, and psychiatric evaluations are relevant to the extent they reflect upon the claimant's condition as of the date last insured, and they must be considered as part of a proper evaluation. *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989). In *List v. Apfel*, 169 F.3d 1148, 1149 (8th Cir.1999), the Court wrote:

Retrospective medical diagnoses constitute relevant evidence concerning the degree of disability prior to the expiration of the insured period. *See Jones v. Chater*, 65 F.3d 102, 104 (8th Cir.1995). "Where the impairment onset date is critical, however, retrospective medical opinions alone will usually not suffice unless the claimed onset date is corroborated, as by subjective evidence from lay observers like family members." *Id.*

Also, evidence outside the relevant time period cannot serve as the only support for the disability claim. "Such a holding would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed." *Pyland v. Apfel*, 149 F.3d 873, 878 (8th Cir.1998).

■ In the case at bar, Plaintiff was insured from October 1, 1978 until June 30, 1982. Tr. at 15. The only medical evidence prior to 1978, the hospital records

from September 1975, do not establish a severe impairment. None of the medical evidence which is dated from April 1996 forward, establishes that Plaintiff's mental health conditions were diagnosed or treated before the expiration of her insured status. Although there is some indication that Plaintiff was treated at West Central Mental Health Center between the time she left the hospital at Clarinda and the time of Dr. Heiss' evaluation on April 11, 1997, there are no treatment records or reports which would establish a diagnosis or opinion regarding severity of Plaintiff's illness at any time before Plaintiff's insured status expired. Since it was Plaintiff's burden to provide medical evidence of a severe impairment prior to that time, it is the holding of this Court that the ALJ's finding that Plaintiff is not disabled for purposes of Title II is supported by substantial evidence on the record as a whole and is affirmed.

Plaintiff filed her application for Title XVI benefits on January 14, 1997. Dr. Countryman's office notes establish that in 1996, Plaintiff was being treated for ADD and anxiety with prescription medication. All of the remaining medical evidence is consistent in the opinion that Plaintiff is unable to function in work situations. For example, Mr. Schulte observed that Plaintiff has difficulty completing tasks. Dr. Hopkins opined that Plaintiff is inhibited in her ability to function in a competitive work environment due to ADHD and anxiety. Dr. Heiss observed that in addition to ADD and anxiety, Plaintiff shows symptoms of depression and a personality disorder. As a result, Dr. Heiss opined that Plaintiff has difficulty functioning in all situations of much complexity and that anxiety causes Plaintiff to "cognitively ... shut down." Dr. Heiss continued: "Pace and concentration would vary according to her anxiety level and emotional state." The psychologist who reviewed the medical records for Disability Determination Services opined that Plaintiff often fails to complete tasks in a timely manner because of her impairments. Dr. Tedesco also stated that Plaintiff is moderately limited in her ability to complete normal work days or work weeks and that she is unable to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Cavallin, who Plaintiff testified that she sees on a regular basis, opined that Plaintiff is markedly limited in her ability to work.

The ALJ rejected Dr. Cavallin's opinion because he found it inconsistent with the other evidence in the record and because Dr. Cavallin is not a treating physician. Tr. at 22. The ALJ is clearly wrong on both points. Dr. Cavallin's opinion is consistent with the opinions and diagnoses expressed by every other clinical social worker, psychologist and psychiatrist who has seen or treated Plaintiff, as well as by the psychologist who reviewed the medical records. The Court of Appeals for the Eighth Circuit has stated that it is error for an ALJ to substitute his or her lay judgment for that of the physicians. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990) citing *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir.1989). In *Holmstrom v. Massanari*, 270 F.3d 715, 720 (8th Cir. 2001), the Court wrote:

"The [social security] regulations provide that a treating physician's opinion ... will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'" *Prosch v. Apfel*, 201 F.3d 1010, 1012–13 (8th Cir.2000) (alteration in original) (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ may discount such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.

*Id.* at 1013. Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting. *Id.* (citing 20 C.F.R § 404.1527(d)(2)).

■ In this case, Plaintiff sees Dr. Cavallin on a monthly basis, and he prescribes Plaintiff's medication. Tr. at 157 & 163 as well as Plaintiff's hearing testimony. There is no allegation that Dr. Cavallin's opinion is not "well-supported by medically acceptable clinical ... diagnostic techniques" and it is not inconsistent with the opinions of the other physicians who have treated or examined Plaintiff. Finally, the ALJ did not provide good reasons for discounting Dr. Cavallin's opinion. The doctor's opinion, therefore, was entitled to controlling weight and is substantial evidence which detracts from the ALJ's decision.

■ Dr. Cavallin's report which is dated October 6, 1998 was submitted to the ALJ on October 15, 1998. The report, therefore, was not available for the September 30, 1998 hearing and could not form the basis of a hypothetical question. Plaintiff's representative, however, asked a hypothetical question which was based on Dr. Tedesco's findings. In response to this hypothetical, the vocational expert testified that no work was possible. The ALJ wrote that Dr. Tedesco's opinion that Plaintiff often has deficiencies of concentration, persistence and pace resulting in failure to complete tasks in a timely manner could only be used to make a determination at step three of the sequential evaluation and was not intended to be a part of a residual functional capacity assessment. Tr. at 23. The Court disagrees. Ratings of "moderate", "often", or "once/never" on the PRTF, while not supporting a finding of disabled at the third step of the sequential evaluation, may support a finding of disabled at the fifth step. *Pratt v. Sullivan,* 956 F.2d 830, 835 n. 12 (8th Cir.1992).

The ALJ cited Social Security Ruling 96–8p as his authority. Social Security Rulings, however, while binding on the agency, are not binding on the Court and are not conclusive. Social Security Rulings do not have the force or effect of law. *Newton v. Chater,* 92 F.3d 688, 693 (8th Cir. 1996). Dr. Tedesco's opinion expressed on the PRTF, therefore, is substantial evidence which detracts from the ALJ's decision.

■■ Testimony from a vocational expert is substantial evidence only when it is based on a properly phrased hypothetical question that captures the concrete consequences of the claimant's impairments. *Taylor v. Chater,* 118 F.3d 1274, 1278 (8th Cir.1997). Dr. Tedesco's opinion that Plaintiff often has deficiencies of concentration, persistence and pace resulting in failure to complete tasks in a timely manner is consistent not only with Dr. Cavallin's later opinion, it is, as pointed out above, consistent with the other psychologists and psychiatrists who have seen Plaintiff as well as with Dr. Countryman. In fact, Dr. Tedesco did not render his opinion until after he had reviewed the available medical records. On the other hand, the ALJ's opinion that Plaintiff can work except for work requiring use of independent judgment, constant attention to detail, or more than occasional contact with the public, is not supported by any medical evidence in the record whatsoever. The vocational expert's response to the ALJ's hypothetical, therefore, is not substantial evidence supporting his decision. On the other hand, the vocational expert's response to the hypothetical which took into account the concrete consequences of Plaintiff's impairments is substantial evidence which detracts from the ALJ's decision. As the Court stated in *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980), quoting *Thomas v. Celebrezze,* 331 F.2d

541, 546 (4th Cir.1964) wrote: "Employers are concerned with substantial capacity, psychological stability, and steady attendance.... It is unrealistic to think that they would hire anyone with the impairments of this claimant." *See also, Hutsell v. Massanari,* 259 F.3d 707, 713 (8th Cir.2001) citing *Parsons v. Heckler,* 739 F.2d 1334, 1340 (8th Cir.1984).

Plaintiff argues that the proper remedy in this case is a remand with directions to the ALJ to properly develop the record. In *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987), the Court wrote: "Ordinarily, where the Secretary has incorrectly allocated the burden of proof based upon an erroneous finding that the claimant can return to his prior work, we will remand for further proceedings. However, where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his disability by medical evidence on the record as a whole, we find no need to remand." Likewise, in *Seavey v. Barnhart,* 276 F.3d 1, 11 (1st Cir.2001), the Court, discussing whether a reviewing court should remand with instructions or award benefits, wrote:

> [I]f the evidence and law compelled one conclusion or the other, then the court could order an award of benefits or affirm a denial of benefits. For example, a judicial award of benefits would be proper where the proof of disability is overwhelming or where the proof is very strong and there is no contrary evidence. *See Mowery v. Heckler,* 771 F.2d 966, 973 (6th cir.1985). Similarly, if correcting the legal error clarified the record sufficiently that an award or denial of benefits was the clear outcome, then the court may order payment or affirm denial. Conversely, if an essential factual issue has not been resolved, as here, and there is no clear entitlement to benefits, the court must remand for further proceedings.

In the case at bar, although the ALJ stopped the sequential evaluation at the fourth step, finding that Plaintiff is able to do her past relevant work, hypothetical questions were put to a vocational expert which considered Plaintiff's ability to do work at both the fourth and fifth steps of the sequential evaluation. When the restrictions set forth by Dr. Tedesco were put into the form of a hypothetical, the vocational expert testified that no work is possible. In addition, when the vocational expert was asked for further comment by the ALJ, it was his testimony that "the inability to show up for work on a regular basis" would eliminate jobs cited in response to the ALJ's first hypothetical question. If the case were remanded so that a hypothetical question based on Dr. Cavallin's opinion could be put to the vocational expert, the testimony would be the same as when confronted with Dr. Tedesco's opinion. Having searched this entire record and having found no substantial evidence which is contrary to Dr. Cavallin's testimony, it is this Court's opinion that the only purpose served by a remand for further proceedings would be to delay the receipt of benefits to which Plaintiff is entitled. To borrow language from Judge Lynch in the passage quoted above from *Seavey,* there is no "essential factual issue" which needs to be resolved by a remand to the Commissioner. Therefore, the Commissioner is hereby ordered to award Plaintiff the benefits to which she is entitled. *See also Taylor v. Chater,* 118 F.3d at 1279 (remand not necessary where the record overwhelmingly supports a finding of disability); *Holmstrom v. Massanari,* 270 F.3d at 722 (remand for further proceedings except for award of benefits unnecessary where disability is established).

## CONCLUSION AND DECISION

The Court holds that Commissioner's decision is not supported by substantial

evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen,* 660 F.Supp. 276, 279 (W.D. Ark. 1987). The medical and vocational evidence establish that Plaintiff does not have the residual functional capacity to work either at her past relevant work as the ALJ found, or any other work in the national economy. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. Therefore, reversal with an award of benefits is the appropriate remedy. *Parsons v. Heckler,* 739 F.2d 1334, 1341 (8th Cir.1984).

Defendant's motion to affirm the Commissioner, in so far as it relates to Plaintiff's claim for Title II benefits, is granted. The motion to affirm the Commissioner's decision as it relates to Plaintiff's claim for Title XVI benefits is denied. This cause is remanded to the Commissioner for computation and payment of benefits base on her application for Title XVI benefits. The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.