**Janice GOTZ, Plaintiff,**

v.

**Jo Anne BARNHART, Commissioner of the Social Security Administration, Defendant.**

**No. 01–C–0094.**

United States District Court, E.D. Wisconsin.

June 25, 2002.

David F. Traver, Milwaukee, WI, for Plaintiff.

Penelope C. Fleming, Milwaukee, WI, for Defendant.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Janice Gotz filed this action under 42 U.S.C. § 405(g) seeking review of

the decision of defendant Jo Anne Barnhart, Commissioner of the Social Security Administration ("defendant" or "the Commissioner"), denying her application for disability benefits under the Social Security Act. The matter was assigned to Magistrate Judge William E. Callahan, Jr. for pretrial purposes, and on January 8, 2002 he issued a recommendation that the decision be reversed and the case remanded for further proceedings.[1] Defendant filed no objections, but plaintiff did, arguing that an award of benefits rather than a remand was the appropriate remedy. The parties thus appear to agree that the decision denying plaintiff's application should be reversed but disagree as to the remedy. The matter is now before me for decision.

## I. FACTS AND BACKGROUND

### A. Plaintiff's Application for Benefits

Plaintiff applied for disability insurance benefits on November 26, 1996,[2] alleging that since February 1994 she had been unable to work as the result of fibromyalgia,[3] severe migraine headaches, irritable bowel syndrome, chronic fatigue syndrome, osteoarthritis, mild panic attacks and myofascial pain syndrome. Plaintiff wrote that she experienced terrible pain on a daily basis and that her memory was poor. She indicated that when doing something she had to rest fifteen minutes out of every hour. She wrote that she cooked three times a week, did small amounts of cleaning, shopped once a week with assistance, and did laundry "on a good day." (Tr. at 134.)[4] She wrote that she engaged in no recreational activities or hobbies and watched television on and off all day until bedtime. She stated that she slept nine to twelve hours a night and did not function for about two hours after waking up.

The claim was denied on June 21, 1997. Plaintiff requested reconsideration but on January 31, 1998 her request was denied. Plaintiff then asked for a hearing, and on August 11, 1998 she appeared with counsel before Administrative Law Judge ("ALJ") Sharon A. Bauer.

### B. Hearing Testimony

Plaintiff and vocational expert ("VE") Beth A. Hoynik were the only witnesses. Plaintiff testified first, stating that she was fifty-four years old, five feet three inches tall, and weighed 176 pounds. She indicated that she had a high school education and one additional semester at MATC where she studied communication skills. She stated that she had last worked from November 1985 to February 1994 in the central accounting office of the F.W. Woolworth Company.[5] Her position was cleri-

---

1. Because the parties had not consented to full magistrate judge jurisdiction Judge Callahan could not decide the case but only recommend a decision.

2. On November 2, 1994 plaintiff had previously applied for benefits but her application was denied on January 1, 1995. That application is not in the record.

3. "Fibromyalgia is a syndrome involving chronic widespread and diffuse pain throughout the entire body, frequently associated with fatigue, stiffness, skin tenderness, and fragmented sleep." Estok v. Apfel, 152 F.3d 636, 637 n. 1 (7th Cir.1998) (citing Robert M. Bennett, "The Fibromyalgia Syndrome," in

The Textbook of Rheumatology 511 (5th ed. 1997) & Sarchet v. Chater, 78 F.3d 305, 306–07 (7th Cir.1996)).

4. Citations to the administrative record are designated "Tr. at ____." Citations to papers filed in this court are designated "R. ___ at ____."

5. The transcript indicates that the employment ended in "February of '84." (Tr. at 38.) However, it is clear from the record that this statement was either a typographical error in the transcription of the hearing tape or a misstatement by the ALJ in phrasing the question.

cal/accounts payable and involved checking computerized reports against invoices, computer input, resolving problems with freight, preparing letters and forms, and opening mail. When working she usually sat, although her job involved some walking and standing and lifting of about ten pounds. She sat for about six hours and was on her feet about two hours out of an eight hour day.

Plaintiff indicated that she was laid off due to downsizing on February 20, 1994. She stated that she then collected unemployment compensation for twenty-six weeks and looked for work unsuccessfully.

Plaintiff testified that in 1985, prior to her job at Woolworth's, she worked as a temporary clerical worker for Hours Steel for several months. Before that she was employed as lead security agent at the Boston Store where she patrolled the floors to detect and apprehend shoplifters and trained and supervised new agents. At this job she stood and walked most of the time.

Plaintiff testified that her regular physician was Dr. Hare and that she saw Dr. Bogunovic for her fibromyalgia. Dr. Bogunovic gave her injections, performed tender point tests and had physical therapy performed on her sore points. She also had physical therapy at Curative Rehabilitation Center. She denied ever seeing a psychiatrist, psychologist, counselor or therapist. She indicated that she took Paxil, Ambien (for sleeping), Motrin 600 mg and Tagamet.

Plaintiff testified that while working for Woolworth's in 1988 she began experiencing pain in her legs, forearms, elbows, shoulders and neck. The pain subsided somewhat but returned in 1991, requiring therapy on her ankle, shoulder, hand and elbow. The pain began to interfere with her work and on several occasions required her to go home. She used all of her sick days because of her migraine headaches. The pain worsened after she left her job in February and was at its worst by Christmas of 1994 when she experienced severe pain throughout her body. In January 1995 plaintiff saw a new doctor who suspected fibromyalgia and referred her to Dr. Mark Pearson, a rheumatologist, who confirmed the diagnosis.

Plaintiff testified that she had good days and bad days. On a good day she could go to the grocery store, make dinner and possibly do a load of laundry. The next day she could barely get out of bed. On a bad day she could not even get dressed and stayed in bed or on a lounge chair. She testified that she had perhaps two good days a week but only three or four "real good days" a month. (Tr. at 58.) She had several bad days a week.

Plaintiff testified that she rarely cooked or did house work. She also indicated that she had problems holding things, especially a pen. She had to hold dishes in the middle of her hand rather than with her thumb and fingers because she dropped them. She indicated that she had two sore spots in her lower back that hurt when she bent down, and that she could not lift anything while bending down. She testified that she could lift maybe ten pounds, walk a block and a half before stopping and resting, sit for maybe an hour and stand about forty-five minutes. She indicated that she had to sit down for fifteen minutes out of every hour. Plaintiff denied that she could hold any kind of job on a regular basis because she could not be reliable, experienced fatigue requiring that she rest or nap during the day and had problems with concentration.

VE Hoynik testified that plaintiff's detective job at the Boston Store would be considered a light, semi-skilled position. She indicated that plaintiff's clerical or "checker II" job at Woolworth's would be considered sedentary, semi-skilled work.

The ALJ then asked several hypothetical questions. The first was whether a person 51 to 55 years old with plaintiff's education who could sit, stand and walk at least six of eight hours, and lift, carry, push and pull frequently up to 25 pounds, occasionally 50 pounds, could perform plaintiff's past work, as she did it or as it is generally performed. Hoynik answered in the affirmative to both.

The second question considered the same person but with the restrictions of ten pounds lifting and standing and walking two out of eight hours. Hoynik indicated that this person could do the clerical but not the detective job.

The third question added that the person would need an option to sit or stand in about one hour increments, and could do no prolonged or repetitive grasping or pinching and no overhead work or pushing and pulling. Hoynik indicated that the person could do the checker II job. However, when the requirement of getting up every hour and walking for approximately fifteen minutes was added to the hypothetical by plaintiff's counsel, she changed her opinion. Hoynik also found it problematic if the hypothetical employee had marked manipulative limitations.

The final question was based on Dr. Bogunovic's report of July 13, 1998 in which he restricted plaintiff to zero hours sitting and standing and walking one to two blocks. Hoynik indicated that such a person would not be able to perform plaintiff's past work or any other work.

## C. Medical Evidence

At the hearing the ALJ received extensive medical records from several sources. Plaintiff received her primary care at Family Health Plan but was seen by various other providers. The Family Health Plan records showed that plaintiff received treatment from Dr. DeBoe for left shoulder pain in February 1994. Over the course of 1994 she was seen for various other issues, including migraines, right knee pain, carpal tunnel-type symptoms, ankle pain and diffuse stiffness and pain in her fingers and wrists. Records from North Shore Orthopaedics revealed that plaintiff was seen there on October 11, 1994 complaining of pain in her knees. She had previously been seen there for right knee pain in 1988. Plaintiff reported having done well until recently when she began experiencing more pain and discomfort and had a severe episode of pain while bowling. The doctor diagnosed probable chondromalacia of the patella [6] and treated her conservatively with medication.

Plaintiff returned to North Shore on November 15, 1994 with continuing pain in her right knee, as well as pain in her right ankle that the doctor suspected was peroneal tendonitis. Plaintiff also had other joint complaints including problems with her neck and wrists. X-rays taken at Family Health Plan in December 1994 revealed osteoarthritis involving the interphalangeal joints.

In January 1995 plaintiff saw Dr. Stedje at Family Health Plan complaining of joint pain and problems with her hands. Dr. Stedje diagnosed osteoarthritis and possible fibromyalgia syndrome. Plaintiff was then seen at the West Suburban Center for Arthritis on February 3, 1995 complaining of diffuse aches and pains. Dr. Pearson believed that her problems were the result of fibromyalgia. He also suggested a referral to a psychologist for stress management.

---

6. Chondromalacia is softening of the cartilage. *Stedman's Medical Dictionary* 332 (26th ed. 1995).

Plaintiff then received therapy at Curative Rehabilitation Center. She complained of pain in her neck, hip, lower back, knees and shoulder. She also reported significant pain in her hands and difficulty in turning door knobs, opening mascara and jars, writing and lifting. She received thumb splints and was provided with therapy and stretching/strengthening exercises. She was discharged in April 1995 with instructions to continue her home exercise program. Her prognosis was "fair."

Plaintiff returned to Dr. Stedje in July 1995 complaining of increased fatigue and difficulty in completing as many activities as she wished. Throughout 1995 plaintiff was seen at Family Health Plan for various issues unrelated to her disability claim such as sinusitis.

Plaintiff was again seen at Family Health Plan on March 13, 1996 regarding her fibromyalgia. Dr. Stedje noted that plaintiff was exercising three times per week by performing a Richard Simmons tape that lasted seventy minutes. Plaintiff also received additional therapy at Curative for her right arm in March and April 1996 and for her right thumb in May 1996.

Plaintiff was again seen at Family Health Plan on April 17, 1996 complaining of increasing pain in the right upper extremity and neck. The doctor's impressions were fibromyalgia in suboptimal control; insomnia, perhaps related to depression and/or fibromyalgia flare; and osteoarthritis in suboptimal control. Plaintiff received chiropractic treatment in May and June 1996 which seemed to help.

Plaintiff returned to the West Suburban Center for Arthritis on May 8, 1996 complaining of increasing thumb pain. The doctor noted "degenerative changes over the bases of her thumbs but most of the majority of this may be fibromyalgia." (Tr. at 247.) The doctor prescribed Ambien, heat and ultrasound treatment, and exercises for her thumbs. On May 9, 1996 plaintiff saw Dr. Stedje, who indicated that while plaintiff's symptoms waxed and waned they "have prohibited her from being able to work over the past year or so." (Tr. at 294.)

On August 21, 1996 plaintiff was evaluated by Dr. Hoyer at Family Health Plan. Dr. Hoyer noted that plaintiff had migraine headaches about once a month, usually manageable with medication, a history of irritable bowel syndrome well controlled of late, osteoarthritis and fibromyalgia with a lot of hand symptoms, and a history of gastroesophageal reflux disease. Plaintiff was taking eleven different medications and vitamins. Plaintiff was prescribed Prozac in September 1996 but stopped taking it due to side effects and was given Paxil.

Plaintiff was again seen at Family Health Plan on April 1, 1997 complaining of neck and upper back pain. The doctor ordered x-rays, which revealed mild spurring and moderate stenosis in the cervical spinal area. She received chiropractic treatment. Plaintiff was again seen at West Suburban on April 23, 1997, was still taking Paxil and Ambien, but continued to have diffuse aches and pains. The doctor injected each first CMC joint with Aristospan and stressed the importance of aerobic exercise for her fibromyalgia.

Plaintiff was seen again at West Suburban on September 15, 1997 with increasing thumb pain and diffuse fibrisistic symptoms. The doctor believed that her fibromyalgia was the "major contributing factor here due to stress and depression." (Tr. at 245.) He referred her to therapy for more heat and ultrasound and to obtain thumb splints. Plaintiff was seen at Family Health Plan in August and September 1997 for bilateral heel pain and in October 1997 for bilateral hip pain. An x-ray of her hips was negative.

Plaintiff began seeing Dr. Dragon Bogunovic in December 1997 for therapy related to her fibromyalgia. On April 30, 1998 he reported that plaintiff was limited to office work and required frequent changing of position from sitting to standing. On May 18, 1998 he reported that her diagnoses were systemic fibromyalgia with multiple trigger points, signs of depression and anxiety, and possibly mild borderline hypothyroidism. He indicated that her prognosis was poor and that it would be difficult for her to perform work, especially with her hands. He concluded: "She is physically disabled to perform hand work, and also standing and walking, due to knee problems; lifting and carrying, because of weakness; elements of depression; additionally, menopausal changes are involved; borderline hypothyroid." (Tr. at 406.)

On July 13, 1998 Dr. Bogunovic completed a Residual Functional Capacity Questionnaire in which he restricted plaintiff to one or two blocks walking and no continuous sitting or standing. In a July 20, 1998 letter he indicated that plaintiff was incapacitated from any work using both hands, could not lift or carry, and that any kind of full-time work could aggravate her condition because she experienced constant pain and weakness.

The ALJ also received evaluative reports from several sources. Consultative examining physician Ward Jankus, M.D. prepared a report dated May 30, 1997. His impressions were fibromyalgia and probable early osteoarthritis. He indicated that a specific work capacity assessment was difficult to make as there were no major orthopedic or neurological abnormalities. The issue was "more of diffuse muscle and joint tenderness with fibromyalgia associated with fatigue and probably some component of depression." (Tr. at 233.) He estimated that plaintiff could stand for forty-five minutes after which she would need a fifteen minute break.

Sitting capacity was estimated to be six to eight hours out of an eight hour work day with stretch breaks every hour or two to keep from getting overly stiff. He opined that plaintiff should avoid work requiring repetitive or prolonged grasping or pinching; lifting capacity was estimated at ten pounds but not continuously.

On June 13, 1997 Henry K. Kaplan, Ph.D. completed a Psychiatric Review Technique report in which he opined that plaintiff had no medically determinable mental impairment. On January 27, 1998 Jack Spear, Ph.D. completed the same form and concluded that plaintiff had an affective disorder—depression/stress secondary to fibromyalgia. However, he opined that she had no more than slight functional limitations as a result and did not meet any of the listings.

On June 17, 1997 Dr. Robert Callear completed a Residual Physical Functional Capacity Assessment in which he opined that plaintiff could occasionally lift ten pounds, less than ten pounds frequently, stand or walk two hours during an eight hour work day, sit about six hours, and had no restrictions on pushing and pulling. He found no postural, manipulative, visual, communicative or environmental limitations. However, he wrote that plaintiff was "very functionally limited [secondary] to pain." (Tr. at 376.) He wrote that after sitting for forty-five minutes plaintiff must move. He rated her work capacity as sedentary. On January 26, 1998, Dr. Baumblatt reviewed the file and affirmed the evaluation.

On May 21, 1998, after reviewing the file, Dr. Dean Smith completed a Residual Functional Capacity Assessment report stating that plaintiff could occasionally lift 50 pounds, frequently lift 25 pounds, and sit or stand six hours in an eight hour work day. He believed that she could perform medium work.

## D. The ALJ's Decision

On October 22, 1998, the ALJ issued her decision. She applied the familiar five step test used to determine whether a person is disabled under the Social Security Act. Under this test the ALJ determines: (1) whether the claimant is presently unemployed; (2) if so, whether the claimant has a severe impairment or combination of impairments; (3) whether any of the claimant's impairments are listed by the Social Security Administration as being so severe as to preclude substantial gainful activity; (4) if not, whether the claimant possesses the residual functional capacity ("RFC")[7] to perform her past work; and (5) if not, whether the claimant is able to perform any other work in the national economy in light of her age, education and work experience. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.2000); *Rucker v. Chater*, 92 F.3d 492, 494 (7th Cir.1996). A claimant is found disabled if she makes the requisite showing at steps one through three. *See Henderson ex rel. Henderson v. Apfel*, 179 F.3d 507, 512 n. 3 (7th Cir.1999). If the claimant is unable to satisfy step three, she must demonstrate that she lacks the RFC to perform her past work. *Id.* If she makes this showing, the burden then shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. *Id.*

The ALJ concluded that plaintiff had not worked since February 1994 (step one) and had fibromyalgia and degenerative joint disease of the cervical spine, both severe impairments (step two). However, she ruled that these impairments were not severe enough to be presumptively disabling (step three). She stated that plaintiff's chronic fatigue, pain and headaches were considered as part of her fibromyalgia and

joint disease and were not considered severe impairments themselves. She concluded that plaintiff's migraine headaches and irritable bowel syndrome did not cause significant work related limitations and were not severe. She further found that plaintiff's depression was not a severe impairment.

The ALJ then found that plaintiff's claim failed at step four. She stated that while plaintiff was limited to sedentary work she could perform her past relevant work. "The claimant's accounts payable/checker job involved sedentary, semi-skilled work." (Tr. at 22.) The ALJ thus concluded that plaintiff was not disabled.

The ALJ dismissed plaintiff's complaints of significant fatigue, pain and memory problems. She noted that plaintiff's medications had not changed for several years, suggesting that they were "at least minimally effective at reducing the [plaintiff's] pain and improving her sleep." (Tr. at 20.) The ALJ reasoned that changes in medication would be expected if plaintiff truly were incapacitated by pain 26 or 27 days per month, as alleged. The ALJ also noted that aside from chiropractic plaintiff had received no intensive or frequent treatment. She stated that plaintiff lost her last job due to downsizing not because of her impairments. She wrote that plaintiff's "alleged memory difficulties were not observed at the hearing." (Tr. at 20.) Finally, she noted that plaintiff's allegation that she could not work since 1994 was inconsistent with the activities in which she engaged, such as bowling, arts and crafts and driving a car.

The ALJ also criticized the medical opinions of Dr. Bogunovic, stating that the restrictions of no sitting or standing (meaning that plaintiff must either walk or

---

7. "RFC is what an individual can still do despite his or her limitations." SSR 96–8p, 1996 WL 374184, at *2.

lie down) were "absurd." (Tr. at 21.) She noted that his work assessment was inconsistent with treatment recommendations from other doctors and with plaintiff's activity level and was not supported by his treatment notes. She further noted that Dr. Bogunovic imposed steadily more severe restrictions in May, June and July 1998 "despite a complete lack of evidence to show the claimant's medical condition changed." (Tr. at 21.) She thus concluded that his assessments were entitled to "significantly less weight." (Tr. at 22.) Instead, the ALJ credited the opinions of Drs. Callear and Baumblatt that plaintiff was limited to sedentary work, which reflected plaintiff's "subjective pain limitations and activity level." (Tr. at 22.)

### E. Plaintiff's District Court Action and Allegations of Error by the ALJ

Plaintiff sought review by the Appeals Council but was denied. She then brought the present action alleging three errors on the part of the ALJ. First, she argued that the ALJ erred in denying the claim at step four by failing to articulate whether plaintiff could perform her past work as she did it or as it was found in the national economy, and by failing to list the specific physical requirements of such work and assess whether plaintiff could meet them. Second, she argued that the ALJ did not determine whether plaintiff could manage a regular work schedule. Third, she alleged that the ALJ improperly evaluated her mental impairment. She requested a judicial award of benefits or, in the alternative, a remand pursuant to section 404(g), sentence four. Defendant initially defended the ALJ's decision, arguing that there was substantial evidence to support the finding that plaintiff had the RFC to perform her past work on a full-time basis, and that plaintiff failed to present sufficient evidence of a mental impairment.

On January 8, 2002, Magistrate Judge Callahan issued his recommendation. Regarding plaintiff's first claim of error, he found that the ALJ had determined that plaintiff could return to her past work but had failed to list the physical requirements of that work and to assess plaintiff's ability to satisfy such requirements. He thus recommended that the case be remanded for determination of those issues. He next determined that although there was substantial evidence to support the ALJ's finding that plaintiff could work full-time, the ALJ would no doubt find it necessary to again address this issue on remand. Finally, Judge Callahan found that the record with regard to any possible mental impairment was fully and fairly developed.

Plaintiff filed partial objections, arguing that the Magistrate Judge erred in recommending affirmance of the ALJ's findings that plaintiff could return to her past work, manage a regular work schedule and had no severe mental impairment. She argued for a judicial award of benefits rather than a remand for further proceedings. Defendant did not object to the recommendation and, in response to plaintiff's objections, argued only that a judicial award of benefits was not appropriate.

## II. APPLICABLE STANDARDS OF REVIEW

### A. Standard of Review of Magistrate's Recommendation

Where a party timely objects to a magistrate's recommendation, I conduct a de novo review of the objected to portions, 28 U.S.C. § 636(b)(1); *see United States v. Raddatz*, 447 U.S. 667, 673–76, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); and may review de novo any other aspects as I see fit. *See Delgado v. Bowen*, 782 F.2d 79, 81–82 (7th Cir.1986). Because plaintiff has objected, I will conduct a de novo review.

## B. Standard of Review of ALJ Decisions[8]

Under section 405(g), a district court may affirm, modify or reverse an ALJ's decision, with or without remanding the case for a rehearing. 42 U.S.C. § 405(g). However, review of the decision is limited, and the ALJ's findings must be upheld if supported by substantial evidence. *Diaz v. Chater,* 55 F.3d 300, 305 (7th Cir.1995). Substantial evidence is such evidence as a reasonable mind would accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). In determining whether substantial evidence exists, the district court must take into account both evidence in support of a conclusion and anything that fairly detracts from its weight. *Young v. Secretary of Health and Human Services,* 957 F.2d 386, 388–89 (7th Cir.1992). The court must review all the evidence in the record, and such review " 'must be more than an uncritical rubber stamp.' " *Delgado,* 782 F.2d at 82 (quoting *Garfield v. Schweiker,* 732 F.2d 605, 610 (7th Cir.1984)).

The ALJ has the duty to weigh the evidence, resolve material conflicts, make independent findings of fact and determine the case accordingly. *See Richardson,* 402 U.S. at 399–400, 91 S.Ct. 1420. A reviewing federal court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ. *Binion on Behalf of Binion v. Chater,* 108 F.3d 780, 782 (7th Cir.1997). Where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ. *Id.* However, if the ALJ commits an error of law reversal is required without regard to the volume of evidence in support of the factual findings. *Id.; see also Pugh v. Bowen,* 870 F.2d

1271, 1274 (7th Cir.1989). An ALJ also commits a reversible error if she fails to abide by the Rulings of the Social Security Administration ("SSRs"). *See Prince v. Sullivan,* 933 F.2d 598, 602 (7th Cir.1991); 20 C.F.R. § 402.35(b).

Finally, the ALJ's decision must demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater,* 98 F.3d 966, 971 (7th Cir.1996). "Even if enough evidence exists in the record to support the decision, [the court] cannot uphold it if 'the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.' " *Hodes v. Apfel,* 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (quoting *Sarchet,* 78 F.3d at 307). And "ALJs must not succumb to the temptation to play doctor and make their own independent medical findings." *Rohan,* 98 F.3d at 970.

### III. DISCUSSION

Based on my review of the record I agree that the decision of the ALJ must be reversed. However, for the following reasons I decline to order an award of benefits but rather will remand the case for further proceedings consistent with this decision.

The reasons for my decision follow.

### A. The ALJ Erred in Evaluating Plaintiff at Step Four

■ At step four the ALJ must determine whether the claimant has the RFC to perform her past work. This determination is comprised of three phases. *Winters v. Barnhart,* No. 00–2419, 2002 WL 1286134, at *13 (D.Kan. June 5, 2002).

---

8. Where, as here, the Appeals Council declines to review an ALJ's decision, it is the decision of the ALJ that is the subject of

district court review. *Eads v. Secretary of Dept. of Health and Human Services,* 983 F.2d 815, 817 (7th Cir.1993).

In the first phase the ALJ must evaluate the claimant's physical and mental RFC. *Id.* (citing *Winfrey v. Chater,* 92 F.3d 1017, 1023 (10th Cir.1996)). SSR 96–8p, 1996 WL 374184 provides guidance in making this determination. It states: "Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.* at *1.

The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities. At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past work as he or she actually performed it.

*Id.* at *3.

Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately (e.g., "the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours"), even if the final RFC assessment will combine activities (e.g., "walk/stand, lift/carry, push/pull").... It is especially important that adjudicators consider the capacities separately when deciding whether an individual can do past relevant work.

*Id.* at *5.

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted); *see also Myers v. Apfel,* 238 F.3d 617, 620 (5th Cir.2001).

In the second phase the ALJ must determine the physical and mental demands of the claimant's past work. *Winters,* 2002 WL 1286134, at *13. Past work can mean two things: (1) the actual functional demands of a particular job that the claimant performed or (2) the functional demands and job duties of such an occupation as it is generally found in the national economy. *Veal v. Bowen,* 833 F.2d 693, 697 (7th Cir.1987); *see also Wolfe v. Shalala,* 997 F.2d 321, 323 (7th Cir.1993) (citing SSR 82–61).

In the third phase the ALJ must determine whether the claimant has the ability to meet the job demands found in phase two despite the mental or physical limitations found in phase one. *Winters,* 2002 WL 1286134, at *13. This involves a comparison of the claimant's past relevant work with her present mental and physical capacity. Additionally, to justify a finding that the claimant is able to return to her past relevant work the record must establish that she could do so on a sustained basis. *Veal,* 833 F.2d at 697.

■ In making this determination the ALJ cannot simply describe a claimant's job in a generic way, e.g. "sedentary" or "light," and "conclude, on the basis of the claimant's residual capacity, that she can return to her previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Nolen v. Sullivan,* 939 F.2d 516, 518 (7th Cir.1991) (citing *Strittmatter v. Schweiker,* 729 F.2d 507, 509 (7th Cir.1984)); *see also Winters,* 2002 WL 1286134, at *14 ("[T]he ALJ is required by SSR 96–8p to make specific and detailed predicate findings concerning claimant's residual functional capacity, the physical and mental demands of the claimant's past jobs, and how these demands mesh with the claimant's particular exertional and nonexertional limitations.").

■ In the present case the ALJ committed errors in each phase of the step four evaluation.

### 1. Phase One

First, the ALJ failed to engage in the "function-by-function" assessment required by SSR 96–8p prior to expressing RFC in terms of an exertional category. *See Ivey v. Barnhart,* No. 00–CV–2544, 2001 U.S.Dist. LEXIS 22399, at *13 (N.D.Tex. Dec. 18, 2001), *adopted,* 2002 U.S.Dist. LEXIS 599 (N.D.Tex. Jan. 15, 2002). Her discussion of plaintiff's exertional capacity omitted specific evaluation of plaintiff's ability to lift, carry, push and pull. *See* SSR 96–8p, 1996 WL 374184, at *5. She made specific findings only as to sitting, standing and walking. (*See* Tr. at 22.) On remand the ALJ must consider all seven factors.

Second, the ALJ failed to assess whether plaintiff had the capacity to work on a "regular and continuing basis." Instead, her focus was on the plaintiff's ability to sit or stand during a single eight hour day. This is insufficient. *See Wallace v. Apfel,* No. 97–CV–6912, 1998 WL 967376, at *4 (E.D.Pa. Nov.24, 1998) ("[T]he fact that an individual has the ability to do the work involved in a particular job, even on a 'sustained basis' does not necessarily mean that she can sustain such work for a 40–hour work week.").

This omission is critical because of the evidence that plaintiff had "good days" and "bad days" and the ALJ's apparent reliance on plaintiff's "good days" in evaluating her RFC. (*See* Tr. at 19, where the ALJ stated that "the claimant's daily activities and social functioning appear fairly normal, especially on 'good days' regarding her physical symptoms.") The ALJ must determine the frequency of plaintiff's "bad days" and decide if their occurrence precludes full-time work. (*See* Tr. at 78, where the VE stated that three or more absences per month usually resulted in dismissal.)

Therefore, the decision must be reversed and remanded for a determination of plaintiff's RFC on a function-by-function basis and her ability to work on a "regular and continuing basis." *See Myers,* 238 F.3d at 620–21 (reversing and remanding where ALJ failed to discuss all of the strength demands of sedentary work and whether the plaintiff could perform those demands on a regular and continuing basis); *see also Tipton v. Massanari,* No. 00–CV–126, 2001 U.S.Dist. LEXIS 14093, at *23–24 (E.D.Va. Aug. 30, 2001) (reversing and remanding where ALJ made only a cursory statement that plaintiff was capable of sustained activity based on her daily activities and social contacts).

### 2. Phase Two

The ALJ also erred in phase two. In finding that plaintiff could perform her past clerical work the ALJ never specified

whether she was referring to plaintiff's actual job at Woolworth's or the position as it is found in the national economy. Instead, she simply stated "that the claimant is able to perform her past relevant work as an accounts payable/checker." (Tr. at 22–23.) This omission is important because there was evidence that plaintiff's actual job at Woolworth's was "light" work [9] (Tr. at 136) while the vocational expert considered the job "sedentary" [10] as found nationally (Tr. at 74). The ALJ found that plaintiff retained the RFC to perform only "sedentary work." (Tr. at 22.) Thus, if plaintiff's actual past work was "light" she would not be able to do it.

Perhaps the ALJ determined that plaintiff could perform the job as found in the national economy (which could be sufficient to end the inquiry) [11] or that the position was sedentary *both* as plaintiff did it *and* as found nationally (for which there is also some support in the record—*see* Tr. at 40). The ALJ's use of the term "accounts/payable checker" suggests that she conflated the two—plaintiff identified her job at Woolworth's as "clerical accounts payable" (Tr. at 135) while Hoynik labeled the past work a "checker II position" (Tr. at 73–74)—but the ALJ made no finding as

to the exertional requirements of the Woolworth's job. [12] Therefore, I cannot tell if she considered them exertionally equivalent. Because I am not entitled to make findings for the ALJ or fill in gaps in her reasoning, *Shelton v. Old Ben Coal Company*, 933 F.2d 504, 507 (7th Cir.1991), I decline to speculate on the basis for her decision. Instead, the matter must be reversed and remanded for clarification.

### 3. Phase Three

Finally, as the Magistrate Judge correctly found (and as defendant seems to concede), the ALJ failed to set forth the specific physical requirements of plaintiff's previous work and to assess plaintiff's ability to perform those tasks in light of her RFC, as required by *Nolen* and *Strittmatter*. Instead, she merely described the past work as "sedentary, semi-skilled" and concluded that plaintiff was capable of sedentary work. (Tr. at 22.) An ALJ may not simply place past work in a certain exertional category without determining the specific demands of that work and concluding that its demands do not exceed the claimant's abilities. *Winters*, 2002 WL 1286134, at *15. This failure also requires reversal and remand for consideration of

---

9. Light work entails lifting no more than twenty pounds at a time with frequent lifting of up to ten pounds. 20 C.F.R. § 404.1567(b). This is how plaintiff described her job in her application materials. (Tr. at 136.)

10. Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like files, ledgers and small tools. 20 C.F.R. § 404.1567(a).

11. However, assuming such a finding, the ALJ must explore on remand whether plaintiff could perform the frequent reaching, handling and fingering required of the job as described in the Dictionary of Occupational Titles, section 209.687–010. There was evidence that plaintiff had manipulative difficulties which difficulties must be assessed.

12. Defendant suggests that the ALJ found that the Woolworth's job was sedentary because that was plaintiff's testimony at hearing, which testimony the ALJ could adopt over the information in the application materials. (R. 9 at 9, citing Tr. at 40.) However, the ALJ did not say that, *see Castrejon v. Apfel*, 131 F.Supp.2d 1053, 1057 (E.D.Wis.2001) (declining to adopt Commissioner's post-hoc reasoning about what the ALJ "could have concluded"), and plaintiff's testimony about the lifting requirements of the Woolworth's job was elicited through a leading question by the ALJ, who misread the application form from which she was questioning plaintiff. (*See* Tr. at 136.) The form stated that the job required lifting up to twenty pounds, ten pounds frequently. That is light work.

the factors required by *Nolen, Strittmatter*, and SSR 96–8p.[13]

## B. The ALJ Did Not Err in Evaluating Plaintiff's Alleged Mental Impairment

In evaluating an alleged mental impairment ALJs must follow the process outlined in 20 C.F.R. § 404.1520a. *See, e.g., Young*, 957 F.2d at 389. The ALJ must first evaluate the claimant's pertinent symptoms, signs and laboratory findings to determine whether she has a medically determinable impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable impairment the ALJ must "rate the degree of functional limitation resulting from the impairment(s)." 20 C.F.R. § 404.1520a(b)(2). In so doing the ALJ considers four broad functional areas: activities of daily living; social functioning; concentration, persistence and pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

The ALJ then rates the degree of limitation in the first three areas on a five point scale: *none, mild, moderate, marked* and *extreme*. In the fourth area a four point scale is used: *none, one or two, three*, and *four or more*. 20 C.F.R. § 404.1520a(c)(4). If the ALJ rates the degree of limitation in the first three functional categories as *none or mild* and in the fourth area as *none*, the ALJ may generally conclude that the impairment is not severe. 20 C.F.R. § 404.1520a(d)(1). If the impairment is severe, the ALJ must then determine whether it meets or is equivalent in severity to a listed impairment. 20 C.F.R. § 404.1520a(d)(2). If the claimant has a severe impairment that does not meet or equal any of the listings, the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

■ Plaintiff alleges that the ALJ erred in finding that plaintiff was not severely mentally impaired and failed to fully and fairly develop the record concerning her mental impairment. I address each contention in turn.

### 1. Substantial Evidence Supported the ALJ's Finding That Plaintiff Did Not Suffer From a Severe Mental Impairment

Plaintiff faults the ALJ for relying on her lack of treatment, (R. 7 at 11–12, citing *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir.1998)), ignoring record evidence of her impairment, and stating that plaintiff first alleged memory problems at the hearing when the record contained several prior references to such problems. However, I conclude that the ALJ applied the proper legal standard, and that there was substantial evidence in the record to support

---

**13.** In evaluating plaintiff's RFC, the ALJ must also consider plaintiff's nonexertional limitations. *See* SSR 96–8p, 1996 WL 374184, at *6. Nonexertional limitations include difficulty functioning because the person is nervous, anxious, or depressed; has difficulty maintaining attention or concentrating; has difficulty understanding or remembering detailed instructions; has difficulty in seeing or hearing; has difficulty tolerating some physical feature(s) of certain work settings; or has difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. § 404.1569a(c).

The ALJ must consider potential nonexertional limitations such as inability to concentrate, understand and remember in evaluating RFC even if, as here, she concludes that the claimant does not have a severe mental impairment. *See Cruz v. Apfel*, No. 97–CV–1170, 1998 U.S.Dist. LEXIS 23385, at *31–35 (N.D.N.Y. Nov. 4, 1998), *adopted*, 1998 U.S.Dist. LEXIS 23384 (N.D.N.Y. Dec. 21, 1998) (reversing and remanding for consideration of potential nonexertional limitations as part of RFC analysis where plaintiff suffered from fibromyalgia and presented evidence that she was "confused" but ALJ found no severe mental impairment).

her conclusion that plaintiff was not severely mentally impaired.

The ALJ completed a psychiatric review technique form (as required at the time) [14] on which she concluded that while plaintiff had an affective disorder plaintiff was not more than slightly impaired in areas one, two and three, and never suffered episodes of deterioration or decompensation in a work-like setting. She cited evidence of record in support of her conclusions.[15] (*See* Tr. at 19.) She also relied upon the opinions of medical consultants, Drs. Spear and Kaplan. Dr. Spear concluded that while plaintiff had depression secondary to fibromyalgia (Tr. at 382) she had only slight limitations in the first three areas of functioning and never experienced episodes of deterioration or decompensation in a work-like setting. (Tr. at 386.) Dr. Kaplan concluded that plaintiff had no medically determinable impairment. (Tr. at 234.) Thus, the ALJ's finding was supported by substantial evidence, and plaintiff provided no medical report to the contrary.[16]

The ALJ did not base her finding on plaintiff's lack of psychiatric treatment. Rather, she noted that the absence of

treatment was one reason for attaching significant weight to the reports of Drs. Spear and Kaplan. This was not error. Neither did the ALJ improperly evaluate the reports under SSR 96–6p, as plaintiff alleges.

> SSR 96–6p states in pertinent part that (1) findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence; and (2) the ALJ and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.

*Pigram v. Barnhart,* No. 00–C–07163, 2002 WL 187500, at *7 (N.D.Ill. Feb.6, 2002). Here, the ALJ evaluated the doctors' reports properly and explained her reasoning. (*See* Tr. at 19–20.) Indeed, had she ignored such reports, the only medical evidence on the issue of limitation related to mental impairment, she would have committed error under SSR 96–6p.

Finally, while plaintiff correctly points out that the ALJ was mistaken in stating that plaintiff "first alleged difficulties with

---

**14.** At the time of plaintiff's hearing ALJs were required to complete such forms. However, the applicable regulations were amended effective August 21, 2000 to eliminate this requirement. *Winters,* 2002 WL 1286134, at *12 n. 6 (citing 65 Fed.Reg. 50746, 50757–58 (Aug. 21, 2000)).

**15.** The record contained evidence possibly suggesting more severe mental impairment (*See* R. 7 at 12–13 and record citations therein), but it is the ALJ's responsibility to weigh such evidence, not the reviewing district court's. If the ALJ's finding is supported by substantial evidence it must be sustained even if there is also substantial evidence supporting an opposite conclusion. *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir.1986) (en banc); *see also Walker v. Bowen,* 834 F.2d 635, 640 (7th Cir.1987) ("Where conflicting evidence allows reasonable minds to differ as to wheth-

er a claimant is disabled, the responsibility for the decision falls on the ... ALJ."). Neither must the ALJ discuss every piece of evidence. *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir.2001).

**16.** While the reports of Drs. Bogunovic (Tr. at 406–07) and Jankus (Tr. at 223) refer to depression, neither specifies restrictions related to depression or otherwise provides evidence that the depression was "severe." Proof of a mental impairment must be established by medical evidence, not only by the claimant's statement of symptoms. *Scott v. Callahan,* 977 F.Supp. 856, 858 (N.D.Ill.1997) (citing 20 C.F.R. § 404.1508); *see also* SSR 85–28, 1985 WL 56856, at *4 (medical evidence alone is considered in determining whether an impairment is "severe"). Plaintiff presented no such evidence.

memory at hearing," [17] (Tr. at 19), I conclude that, in light of the entire record, this error was harmless. *See Perez Torres v. Secretary of Health and Human Services*, 890 F.2d 1251, 1255 (1st Cir.1989) (finding that although the ALJ misread the record in stating that the claimant had never alleged a mental impairment, a review of the entire record demonstrated that the error was harmless); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989) (holding that court need not remand for "a perfect opinion unless there is reason to believe that the remand might lead to a different result"). Because substantial evidence supported the ALJ's decision and because the misstatement was harmless I decline to reverse on this ground.[18]

## 2. The ALJ Fully and Fairly Developed the Record

Plaintiff also faults the ALJ for not fully developing the record concerning her mental impairment. However, plaintiff was represented by counsel at the hearing, and counsel questioned plaintiff about her problems with memory and concentration. (*See* Tr. at 62–63.) As Judge Callahan noted, plaintiff does not criticize her lawyer's performance nor would such criticism avail.

Plaintiff argues that the ALJ prevented plaintiff from explaining her mental problems. She provides two examples. (R. 7 at 14, citing Tr. at 55 and 57–58.) However, in the first instance her counsel asked her about her physical condition in February 1994 (Tr. at 54), and plaintiff began discussing her feelings about being downsized (Tr. at 55). The ALJ then stepped

in to redirect her answer. This was not improper. Similarly, in the second instance cited by plaintiff, the ALJ properly attempted to direct plaintiff's attention to the question asked by counsel which concerned the frequency of her "bad days," an important subject in this case. (Tr. at 57–58.) There is no evidence that the ALJ precluded plaintiff from presenting evidence relating to mental impairment. Nor, based on the record, can I conclude that the ALJ erred by not asking additional questions. *See Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir.1987) ("When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits.").

In sum, I agree with Judge Callahan that the ALJ did not err in evaluating plaintiff's alleged mental impairment.

## C. The Appropriate Remedy is Remand for Further Proceedings

■ Ordinarily, when an ALJ's errs, the appropriate remedy is to remand for further proceedings or rehearing. However, where the record overwhelmingly supports a finding of disability the court may order an award of benefits. *Meinders v. Barnhart*, 195 F.Supp.2d 1136, 1145 (S.D.Iowa 2002) (citing *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987)); *see also Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir.1994) (holding that "the court can reverse the decision and immediately award benefits only if all essential factual issues have

---

**17.** Plaintiff mentioned memory problems in her application materials (Tr. at 144) and on a few occasions to medical providers (*See, e.g.,* Tr. at 215).

**18.** I note again that on remand, in assessing RFC, the ALJ must consider plaintiff's poten-

tial nonexertional limitations, including memory problems. The fact that plaintiff does not have a separate, severe mental impairment does not mean that these factors may be ignored.

been resolved and the record adequately establishes a plaintiff's entitlement to benefits").

██ Plaintiff argues for a judicial award of benefits. She asserts that Dr. Callear's report and the VE's testimony indicate that she is not able to perform her past work, and that therefore, she passes step four of the evaluation process. She then argues that, in light of her age, education and sedentary work restrictions, Medical Vocational Rules 201.04 and 201.12 direct a finding of disabled.

However, plaintiff's argument is not persuasive. First, the hypothetical question giving rise to the VE's testimony on which plaintiff relies—could plaintiff perform her past work if she had to get up and walk for fifteen minutes after forty-five minutes of sitting (Tr. at 79–80)—does not track Dr. Callear's report. Dr. Callear stated that plaintiff "can sit 45 min[ute]s then must move." (Tr. at 376.) He did not say that plaintiff had to get up and walk for fifteen minutes after sitting for forty-five. Thus, the VE's negative response to the hypothetical does not justify a finding that step four was satisfied, leading to an award of benefits at step five. *Cf. Cunningham v. Apfel,* 222 F.3d 496, 502 n. 9 (8th Cir.2000) (finding that response of VE to flawed hypothetical question cannot constitute substantial evidence).

Second, it is not clear from the record that, under the Medical Vocational Guidelines, otherwise known as "the Grid," plaintiff would prevail at step five. The Grid was designed to direct findings of "disabled" or "not disabled" based on the individual's exertional category (e.g. "sedentary," "light," "medium"), age, education and previous work experience.[19] 20 C.F.R. Part 404, Subpt. P, App. 2. "Where the findings of fact made with respect to a particular individual's vocational factors and residual functional capacity coincide with all of the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00. However, if "any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case." *Id.*

Plaintiff alleges that Rules 201.04 and 201.12 direct a finding that she is disabled. These rules contemplate an individual of advanced age[20] (§ 201.04) or closely approaching advanced age[21] (§ 201.12), with a high school education or more, and with an unskilled or no work history. 20 C.F.R. Part 404, Subpt. P, App. 2, §§ 201.04, 201.12. However, plaintiff's past work was "semi-skilled." (Tr. at 74.) Thus, the rules cited do not fit. Rather, under the Grid, plaintiff would be found disabled or not disabled depending on whether her skills were found to be transferable. 20 C.F.R. Part 404, Subpt. P, App. 2, §§ 201.06, 201.07, 201.14, & 201.15. It is unclear from the present record whether plaintiff possesses such skills. Thus, assuming plaintiff survives step four, the matter must be addressed on remand.

---

**19.** The Grid does not direct a conclusion if a claimant has nonexertional limitations such as mental, sensory or skin impairments that restrict her ability to perform work that she otherwise could perform. In such a situation the Grid is only a "framework to guide [the] decision." 20 C.F.R. § 416.969a(d). In the present case the record indicates that plaintiff may have nonexertional limitations.

**20.** "Advanced age" means 55 and over. 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(f).

**21.** "Closely approaching advanced age" means 50 to 54. 20 C.F.R. Part 404, Subpt. P, App. 2, § 201.00(g).

 

Defendant appears to concede that the lack of evidence regarding transferable skills defeats an automatic award of benefits under Rules 201.04 and 201.12 but argues that the Commissioner carries the burden of proof at step five, that the absence of such evidence is the fault of the Commissioner, and that therefore I should award benefits notwithstanding the lack of evidence. (*See* R. 12 at 1.) In making this argument plaintiff seeks to hold the Commissioner to the same standard as other litigants: if she does not meet her burden then plaintiff wins and can collect benefits; the Commissioner gets no second chance. But this is not the law.

"Because of the nonadversarial nature of Social Security disability determinations, the Commissioner is not a litigant and has no representative at the agency level. Indeed, the model is investigatory, or inquisitorial, rather than adversarial." *Seavey v. Barnhart*, 276 F.3d 1, 8 (1st Cir.2001). At the ALJ level the claimant is the only litigant presenting evidence. *Id.* The ALJ's failure to obtain sufficient evidence from a vocational or medical expert "is an adjudicator making a mistake, not a party litigator failing to present evidence." *Id.* Therefore, the proper remedy for errors at step five is not usually an automatic award of benefits but rather a remand for further proceedings. *See id.* at 10–13.

Of course, this does not mean that the Commissioner gets "endless opportunities to get it right." *Id.* at 13. Where "the delay involved in repeated remands has become unconscionable," *id.,* or the agency has displayed "obduracy" in complying with the law as set down by the court, *Wilder,* 153 F.3d at 804, the court may

step in and award benefits. But this is not such a case. Therefore, the matter will be remanded for further proceedings consistent with this opinion.[22]

## IV. CONCLUSION

For the foregoing reasons, the recommendation of the Magistrate Judge is **ADOPTED** in part; and

**IT IS HEREBY ORDERED THAT** the decision of the Commissioner is **REVERSED,** and this matter is **REMANDED** to the administration for further proceedings consistent with this opinion.

---

22. If on remand the Commissioner decides that plaintiff is disabled, she will have to determine the appropriate onset date. As the ALJ noted, plaintiff has provided varying onset dates. (Tr. at 20.) The onset date currently alleged, February 20, 1994, is the date plaintiff was downsized from Woolworth's. Such date does not appear to be related to plaintiff's ability to work. Yet another reason for remand is to enable the Commissioner to decide this question if necessary.