David E. BLOM, Plaintiff,

v.

Jo Anne B. BARNHART, Commissioner of the Social Security Administration, Defendant.

No. 04–C–0912.

United States District Court,
E.D. Wisconsin.

March 26, 2005.

David Traver, for Plaintiff or Petitioner.

Nora S. Barry, for Defendant or Respondent.

### *DECISION AND ORDER*

ADELMAN, District Judge.

Plaintiff David Blom seeks judicial review of the denial of his application of disability insurance benefits ("DIB") under the Social Security Act. *See* 42 U.S.C. § 405(g). Plaintiff has been receiving supplemental security income ("SSI") since September 1, 2001, due to diabetes mellitus and resulting neuropathy. (Tr. at 93.) The issue in the present case is whether plaintiff was disabled by that condition prior to December 31, 1997, the date he was last insured for DIB.[1] An Administra-

---

1. In order to obtain DIB or SSI, the claimant must be "disabled." The difference between the two programs is that DIB is payable only if the claimant becomes disabled while in "insured status." *See Pyland v. Apfel,* 149 F.3d 873, 876 (8th Cir.1998); *see also* 20 C.F.R. § 404.130 (setting forth methods of determining insured status). SSI is payable regardless of the claimant's insured status so long as he satisfies a means test. *See Splude v. Apfel,* 165 F.3d 85, 89 (1st Cir.1999).

tive Law Judge ("ALJ") determined that plaintiff was not disabled prior to that date and denied his DIB claim. The Appeals Council declined plaintiff's request for review, making the ALJ's decision the final decision of the Social Security Administration ("SSA") for purposes of judicial review. *See Boiles v. Barnhart*, 395 F.3d 421, 424–25 (7th Cir.2005).

## I. APPLICABLE STANDARDS OF REVIEW

### A. Disability Standard

In order to obtain DIB the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ must determine:

(1) Whether the claimant is engaged in substantial gainful activity ("SGA");

(2) If not, whether the claimant has a severe impairment;

(3) If so, whether the claimant's impairment(s) meets or equals one of the impairments listed in SSA regulations as being so severe as to preclude SGA;[2]

(4) If not, whether the claimant retains the residual functional capacity ("RFC") to perform his past relevant work;

(5) If not, whether the claimant can make the adjustment to other work.

*Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir.2004).

An affirmative answer at any step leads either to the next step, or, at steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, ends the inquiry and leads to a determination that the claimant is not disabled. If the claimant reaches step 5, the burden shifts to the SSA to establish that the claimant is capable of performing other work in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir.2001). The SSA may carry this burden either by relying on the testimony of a Vocational Expert ("VE") or by consulting the Medical–Vocational Guidelines, a/k/a "the Grid." *E.g., Schwabe v. Barnhart*, 338 F.Supp.2d 941, 945 (E.D.Wis.2004).

### B. Review of ALJ's Decision

Under § 405(g), the district court's review is limited to determining whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir.2004). The ALJ's findings of fact, if supported by substantial evidence, are conclusive. *Id.* Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001).

■ If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997). The ALJ commits such an error if she fails to comply with the Commissioner's Regulations and Rulings. *Brown v. Barnhart*, 298 F.Supp.2d 773, 779 (E.D.Wis.2003) (citing *Prince v. Sullivan*, 933 F.2d 598, 602 (7th Cir.1991)).

**2.** These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings"). Plaintiff is now receiving SSI based on a listed impairment. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 9.08(A).

■ The ALJ's decision must also demonstrate the path of her reasoning, and the evidence must lead logically to her conclusion. *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir.1996). While the ALJ need not discuss every piece of evidence in the record, she must provide at least a glimpse into her reasoning. *Zurawski*, 245 F.3d at 889. Even if enough evidence exists in the record to support the decision, the court cannot uphold it if the reasons given by the ALJ do not build an accurate and logical bridge from the evidence to the result. *Hodes v. Apfel*, 61 F.Supp.2d 798, 806 (N.D.Ill.1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (1996)).

## II. BACKGROUND

Plaintiff applied for DIB on March 29, 2001, alleging that he was disabled since December 31, 1992,[3] due to complications from diabetes. (Tr. at 55, 61.) He indicated that he had worked as a medical malpractice defense attorney for 25 years but was no longer able to perform that work due to numbness in his legs and arms, frequent falls with resulting injuries, and failing eyesight. (Tr. at 69.) His claim was denied initially on August 28, 2001 (Tr. at 20, 23) and on reconsideration on February 27, 2002 (Tr. at 22, 30). Plaintiff then requested a hearing (Tr. at 34), and on March 5, 2003 he appeared pro se before ALJ Margaret O'Grady (Tr. at 36, 552). Plaintiff's wife and his physician, Dr. Galvani, also testified, as did a VE.

On May 9, 2003, the ALJ issued an unfavorable decision. She concluded that plaintiff had not engaged in SGA between his alleged onset date of December 31, 1992 and his date last insured, December 31, 1997; that he had severe impairments—degenerative joint disease of the cervical spine and diabetes—but that neither met or equaled a listed impairment; and, relying on the testimony of the VE,

that as of his date last insured plaintiff retained the RFC to perform his past relevant work as an attorney. (Tr. at 18.) In making these findings, the ALJ noted that the medical records prior to December 31, 1997, did "not show any ulcers on [plaintiff's] feet or complaints of neuropathy or paresthesias" and that there was "no record of complaints of excessive pain, prescribed narcotic medications, or mental limitations prior to December 31, 1997." (Tr. at 17.) She further noted that Dr. Galvani's testimony focused on plaintiff's "recent condition," that he was "less certain" about plaintiff's condition prior to the date last insured "given the remoteness of the time period," and that he therefore "deferred to treatment records [from] that time period." (Tr. at 17.) Finally, she found that plaintiff's testimony was "not credible to the degree that he [alleged] that he could [not] perform his past relevant job as an attorney as of the date last insured." (Tr. at 18.)

## III. DISCUSSION

Plaintiff argues that the ALJ (1) failed to properly advise him of his right to counsel at the hearing and to fully develop the record in the absence of counsel; (2) failed to properly evaluate the credibility of his testimony; (3) propounded an improper hypothetical question to the VE; (4) improperly evaluated his RFC and past work; and (5) gave inadequate consideration to treating source reports and testimony. I consider each argument in turn.

### A. Right to Counsel and Development of the Record

#### 1. Legal Standard

■ "A claimant has a statutory right to counsel at disability hearings." *Thompson v. Sullivan*, 933 F.2d 581, 584 (7th

---

3. He later amended the onset date to January 1, 1995. (Tr. at 58.)

Cir.1991). The claimant must be properly informed of this right and may waive it only if given sufficient information to enable him to make an intelligent decision on whether to retain a lawyer or proceed pro se. *Id.* To ensure a valid waiver of counsel an ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25% of past due benefits and required court approval of fees. *Binion v. Shalala,* 13 F.3d 243, 245 (7th Cir.1994).

■■■■ If the ALJ does not obtain a valid waiver, the matter must be remanded for a new hearing unless the Commissioner can establish "that the ALJ fully and fairly developed the record."[4] *Id.* The ALJ's duty is met if she probes the claimant for possible disabilities and uncovers all of the relevant evidence. *Id.* If the Commissioner makes the required showing, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." *Id.*

### 2. Analysis

### a. Waiver

■■ At the beginning of the hearing, the ALJ noted that plaintiff appeared without counsel and stated:

> There are various things an attorney or representative's able to do. They can obtain documents. They can present argument on a Claimant's behalf. There are legal services groups that can provide services at low or no costs. There are also private attorneys and non-attorney representatives that can handle Social Security cases. They can take the case on what's called a contingency fee arrangement and that's where the attorney or representative would take a percentage of any back benefits that are paid if the claim is successful. There's a maximum amount allowed by law and any fee would need to be approved by the Administrative Law Judge.

(Tr. at 554–55.) The ALJ then asked plaintiff whether he wished more time to obtain a lawyer or wanted to proceed on his own. Plaintiff stated that he wanted to go ahead. (Tr. at 555.)

Because the ALJ failed to advise plaintiff of the 25% limit on fees, the resulting waiver was defective. *Binion,* 13 F.3d at 245. The Commissioner notes that plaintiff is himself an attorney, and that there is no evidence that he was coerced into appearing pro se. However, she cites no authority for the proposition that a claimant who happens to be a (non-practicing) attorney is not entitled to the same notice as any other claimant. Further, evidence suggested that plaintiff was not, at the time of the hearing, functioning in a manner that would allow him to competently represent anyone, including himself.[5] (Tr. at 582, 585.) Therefore, plaintiff did not validly waive counsel and the burden shifts to the

---

4. Because social security proceedings are non-adversarial, the ALJ always has a duty to ensure that the record is fully and fairly developed. *See, e.g., Ellis v. Barnhart,* 392 F.3d 988, 994 (8th Cir.2005). However, that duty is heightened when a pro se claimant has not validly waived his right to counsel. *Henderson v. Barnhart,* 205 F.Supp.2d 999, 1010 (E.D.Wis.2002) (citing *Thompson,* 933 F.2d at 588).

5. Plaintiff's handling of the hearing suggested that he was not functioning as would a competent attorney. For example, when the hearing assistant brought Dr. Galvani into the hearing room to testify plaintiff asked the ALJ if he should leave. The ALJ told plaintiff to stay because he was representing himself. (Tr. at 577.) Plaintiff's written submissions, unfocused and rife with typographical errors, also show that plaintiff did not represent himself as would a competent attorney.

Commissioner to demonstrate that the ALJ fully and fairly developed the record.

### b. Development of the Record

 Prior to taking testimony, the ALJ advised plaintiff that the issue in the case was whether he could establish disability as of his date last insured, and that his condition thereafter was irrelevant. (Tr. at 557.) However, in her questioning of the witnesses, the ALJ did not heed this admonition.

### i. Plaintiff's Testimony

The ALJ first asked plaintiff about his background. Plaintiff testified that his date of birth was September 17, 1940, that he was married, and lived with his wife. (Tr. at 557–58.) He stated that he was 6'1" tall and weighed 230 pounds. Plaintiff testified that he last worked for pay in February of 2000, performing temporary work as a legal manager. (Tr. at 558–59.) He also had reported income from 1995, 1998 and 2001 resulting from fee splitting on cases he had referred to other lawyers. (Tr. at 559, 587–88.) Plaintiff stated that he became licensed as an attorney in 1971 and was active until 1992. (Tr. at 560.)

The ALJ asked plaintiff: "Do you have pain. Any parts of your body that hurt on a regular basis?" (Tr. at 561.) Plaintiff replied that his feet hurt unless he took Percocet or Oxycontin (Tr. at 561), and that he had pain in his shoulder for which he also took medication (Tr. at 562–63). The ALJ then asked plaintiff why he felt he was disabled and entitled to benefits. (Tr. at 563.) Plaintiff replied that his past work was highly specialized, that he often traveled, and that his arms were numb and that he got ulcers on his feet and could not walk. (Tr. at 563.)

The ALJ then asked: "Are you receiving psychiatric or mental health treatment?" (Tr. at 563.) Plaintiff said no. (Tr. at 563.) The ALJ also reviewed with plaintiff the medications he was currently taking. (Tr. at 564–65.)

The ALJ next asked plaintiff what he did on a typical day. (Tr. at 566.) Plaintiff indicated that he awoke after six or seven hours of sleep, then took Percocet to relieve the burning in his feet. He would clean up, then go lay down on the couch and watch the news. He would then go back to bed after his wife left for work, placing a pillow under this feet. Around noon his adult son would wake him and they would go out for lunch. After lunch, he would return home and go to sleep. His wife would return from work and wake him for supper. He would take more medication around 8:00 or 9:00, which would put him to sleep by 11:00. (Tr. at 567.) Plaintiff stated that he was able to shower but had trouble getting dressed due to lack of dexterity in his fingers. (Tr. at 567.) He indicated that he did not cook, load the dishwasher, do laundry, clean the house, shop or perform yard work. He stated that he read with the aid of a magnifying glass. (Tr. at 568–69.) He drove short distances occasionally. (Tr. at 569–70.) Plaintiff testified that he could walk about a block, used crutches or a cane, could stand or sit for about five or ten minutes, and lift about eight pounds. He stated that he could not bend or stoop without unsteadiness and could not climb stairs. He stated that he could hold a pen and write, but his handwriting was not what it used to be. (Tr. at 571–72.)

The ALJ then asked: "How was your condition in December of 1997 compared to the way it is now?" (Tr. at 572.) Plaintiff stated that he had ulcers on his feet much the same, took aspirin and ibuprofen for pain relief, and his friend Dr. Galvani gave him sample medications. (Tr. at 572–73.) He stated that the ulcers started in 1988 and that Dr. Galvani, whom he met in the late 80's, noticed the change in his

condition. (Tr. at 573.) Rather than continuing with this line of questioning, the ALJ then asked plaintiff if he was diagnosed with diabetes; plaintiff said he was, and the ALJ proceeded to ask questions about medications plaintiff currently took for diabetes.

The ALJ then asked plaintiff if there was anything else he wanted to say about his claim for benefits. (Tr. at 575.) Plaintiff stated that his condition "really got bad" in February 1993. During a trip to Mexico plaintiff developed blisters on his foot, which ruptured. He went to a local pharmacy and bought Penicillin and Keflex, and bandaged his foot. When he returned home he saw Dr. Galvani, who prescribed Penicillin. (Tr. at 575.) Plaintiff stated that he saw several other doctors in the 1990s but could not recall their names. (Tr. at 576.) He added that the insurance companies he had as clients became concerned about his condition and took the work away from him. He stated that he had focused on medical malpractice defense and had no experience in other legal work. (Tr. at 576–77.)

In sum, save for one question, the ALJ focused on plaintiff's current condition.

### ii. Dr. Galvani's Testimony

Dr. Galvani stated that he was a friend of plaintiff and had provided medical treatment from about 1993 to the present. (Tr. at 577.) He stated that he first treated plaintiff regarding foot wounds that developed due to complications of diabetes. (Tr. at 577.) He stated that he provided advice on medications and treatment of the wounds and concerning a broken leg plaintiff suffered in 1993 when he fell off a motorcycle. He also dressed and checked plaintiff's wounds. He stated that he was not plaintiff's primary treating physician; rather, he provided personal advice as a friend. (Tr. at 578.)

The ALJ asked:

Q What impairments does Mr. Blom have? (Tr. at 578.)

A Today, now?

Q Yes.

(Tr. at 379.) Dr. Galvani replied that plaintiff suffered from neuropathy—a nerve injury—caused by his diabetes. This caused problems with coordination and movement, and made plaintiff prone to fall. Plaintiff's vision was also affected, as were his blood vessels. (Tr. at 379.)

The ALJ then asked: "What treatment is he on at this point for any condition?" (Tr. at 580.) Dr. Galvani replied that plaintiff took medication for his blood pressure and cholesterol, antibiotics and salve for his feet, and strong pain pills. Dr. Galvani added that the pain medication caused side effects, including diminished judgment and coordination. (Tr. at 580.)

The ALJ next asked: "When did the impairments of the neuropathy and the diabetes develop?" (Tr. at 580.) Dr. Galvani replied that "they developed to the point of substantial and significant impairment I would say about in '92 to '93." (Tr. at 580.) Rather than continuing with a retrospective line of questioning, the ALJ next asked: "What limitations would he have as a result of the impairments." (Tr. at 581.) Dr. Galvani answered that plaintiff was mentally impaired due to the pain medication such that he could not reliably handle anyone else's affairs, could not walk more than four to eight blocks without risk of foot injury or falling, lift more than eight to ten pounds, and could not carry anything. (Tr. at 581–85.)

On brief questioning by plaintiff, Dr. Galvani indicated that he prescribed plaintiff a topical ointment for foot wounds in about 1994, and provided him with various sample pain medications and antibiotics. (Tr. at 585–86.)

The ALJ failed to properly develop the record with Dr. Galvani. As noted, the issue was plaintiff's condition from 1995 to

1997, not his current condition. Yet virtually all of the ALJ's questions focused on the present. Recognizing the paucity of relevant medical records, the ALJ should have used the occasion of Dr. Galvani's testimony to obtain a "retrospective diagnosis." *Estok v. Apfel,* 152 F.3d 636, 638 (7th Cir.1998); *see also Dousewicz v. Harris,* 646 F.2d 771, 774 (2d Cir.1981) (stating that a "diagnosis of a claimant's condition may properly be made even several years after the actual onset of the impairment"); *Martinez v. Massanari,* 242 F.Supp.2d 372, 377 (S.D.N.Y.2003) ("It is well-settled that the 'treating physician rule' applies to retrospective diagnoses, those relating to some prior time period during which the diagnosing physician may or may not have been a treating source, as well as to contemporaneous ones."). She failed to do so.

### iii. Plaintiff's Wife's Testimony

The ALJ first asked Mrs. Blom what plaintiff did on a daily basis. Mrs. Blom said that she usually found him sleeping. (Tr. at 590.) The ALJ asked if plaintiff needed help with his personal needs, and Mrs. Blom responded that he sometimes needed help dressing. She said that he did no house work. (Tr. at 590.) She further stated that plaintiff's mother usually cooked for him, that plaintiff went to her house every day, and that he engaged in no other activities outside the home. (Tr. at 591–92.)

The ALJ then asked: "Was there anything you wanted to tell me about your husband and about his claim for disability benefits?" (Tr. at 593.) Mrs. Blom replied that plaintiff had been very sick and weak for years. She stated that they had to sell their house in 1996 and that prior to the sale she was doing all of the work, inside and outside. She stated that before his impairments plaintiff had been very

handy, but "that's not possible anymore." (Tr. at 593.) The ALJ asked when plaintiff last performed any of those activities, and Mrs. Blom replied 1990 or 1991. (Tr. at 594.) Plaintiff and his wife both stated that he was very active around the house before his impairments forced him to stop. (Tr. at 597.)

Mrs. Blom further stated that she helped plaintiff out in his office in the early 90s and observed that he "just wasn't handling it." (Tr. at 594.) He was yelling at people because he could not tolerate the pain. She stated that by 1993 he could no longer work: he had numbness in his hands and could not hold a pencil, he could not walk up stairs and so took the ramp to get to his office, and he started falling in 1994 or 1995. (Tr. at 594–95.) Ostensibly returning to the present, she stated that plaintiff did not sleep well or think clearly; for example, he got up in the morning, did not realize that the garage door was closed and tried to drive through the door. She stated that she did not trust him to use the stove because he might forget to turn it off or leave a towel on it and start a fire. (Tr. at 595–96.) She stated that the sores on his feet had worsened over the last ten years and she was afraid he would lose his foot. (Tr. at 598.)

As with the previous witnesses, the ALJ failed to focus Mrs. Blom on the relevant time period, though Mrs. Blom nevertheless provided some relevant testimony.

### iv. Medical Evidence

█ As the ALJ noted, most of the medical records in the file pertain to the time period after plaintiff's insured status lapsed. Consistent with the parties' submissions, I will focus on the records from the relevant period.[6]

On May 30, 1989 plaintiff was seen at the Milwaukee Medical Clinic complaining

**6.** Although the parties do not raise the issue, it is well-settled in this circuit that "medical

evidence from a time subsequent to a certain

of numbness in his arms after a weekend of hard physical labor. (Tr. at 125.) Doctors suspected that plaintiff had carpal tunnel syndrome, but the numbness may have been an early sign of the neuropathy plaintiff developed. (*See* Tr. at 263.) In April 1991 he was seen regarding his diabetes, which according to the note he had since 1988. (Tr. at 125.) He apparently underwent blood tests. (Tr. at 123–24.) An April 18, 1991 note appears to indicate that plaintiff experienced double vision, cramps in his legs and numbness in his toes. (Tr. at 125.)[7] On April 20, 1991, a doctor provided plaintiff with insulin and showed him the procedure for injection. (Tr. at 127.) The doctor suggested hospitalization to get his blood sugars under control but plaintiff declined. (Tr. at 127.) On April 24, 1991 he was seen for "diabetes education" and agreed to work with a dietician. (Tr. at 128.) He returned to the doctor on May 7, 1991, and his recorded blood sugar readings varied. Plaintiff noted the factors that tended to affect his blood sugar and planned to start an exercise program. (Tr. at 129.)

On March 26, 1992, plaintiff underwent a chest x-ray at Family Health Plan ("FHP"), which was normal. (Tr. at 135.) On July 2, 1992, plaintiff had his eyes tested at FHP. (Tr. at 141.) On July 27, 1993, he underwent an x-ray of his right ankle at FHP after falling off his bike the previous day. The x-ray revealed soft tissue swelling but no fracture. (Tr. at 140.) On March 20, 1995, plaintiff underwent an x-ray of the right shoulder at FHP, which was normal. (Tr. at 138.) On May 10, 1996, plaintiff underwent a cervical and

thoracic spine x-ray at FHP. The report indicates that plaintiff had experienced pain in the area for about two weeks. The x-ray revealed possible mild dextroscoliosis of the lower cervical spine and mild spur formation at C5–C6. The doctor could not visualize the T1–T2 area and indicated that if symptoms persisted plaintiff should undergo an MRI. (Tr. at 139.) On June 20, 1997, plaintiff underwent an x-ray of the right third finger at FHP, which revealed soft tissue swelling but no fracture. (Tr. at 134.) On November 3, 1997, plaintiff underwent a chest x-ray at FHP following a dry cough of one month duration despite antibiotics. The x-ray was normal and showed no significant change from a prior x-ray taken on March 3, 1995, which was also normal. (Tr. at 133, 137.) On November 14 and 17, 1998, plaintiff underwent x-rays of his right knee at FHP following reports of instability/giving out without warning. The x-rays revealed no fracture and minimal narrowing of the medial joint compartment, but were otherwise normal. (Tr. at 131, 132.) In March and April 1992, June 1993, July 1994, May 1995, August 1996 and June 1997, plaintiff had various lab tests done at FHP, though it is unclear for what. (Tr. at 143–60.) The record contains no accompanying physician's notes associated with any of these tests or x-rays at FHP. Thus, there appears to be a gap in the medical record, which the ALJ failed to fill.

On January 3, 1995, February 20, 1995 and April 5, 1995, Dr. Galvani prescribed Penicillin, which prescription was filled at Walgreen's pharmacy. (Tr. at 199.)

The above records are the only ones in the file from the relevant time period.

period is relevant to a determination of a claimant's condition during that period." *Halvorsen v. Heckler*, 743 F.2d 1221, 1225 (7th Cir.1984). Thus, it is error for an ALJ to simply ignore evidence that post-dates the insured period. The question in such cases is whether the evidence that post-dates the relevant period is "sufficient to support the earlier evidence." *Nelson v. Callahan*, No. 96–C–7425, 1997 WL 403516 at *6, 1997 U.S. Dist. LEXIS 10319, at *17 (N.D.Ill. July 16, 1997).

7. The note is handwritten and hard to read.

The file also contains several medical reports and records which touch upon plaintiff's condition during the relevant time.

On July 6, 2001, Dr. Albert Jochen, who had treated plaintiff since March 2001, prepared a report for the SSA. Dr. Jochen indicated that plaintiff had a 13 year history of diabetes. He stated:

> The major diabetic complication has been severe advanced peripheral and autonomic neuropathy. The neuropathy has occurred in both feet, his hands and his autonomic nervous system. The symptoms have been particularly severe in both feet and include numbness as well as lack of proprioception. The lack of proprioception means that he cannot sense where his feet are when he walks. He has been unable to perform his usual occupation for the past 4 years because of the travel involved. Specifically, he is unable to travel because of frequent falls. Thus, he has repeatedly injured the tips of his toes during recent years and also had a fracture of his right fibula in late 2000....
>
> His other diabetic complications include borderline hypertension and autonomic neuropathy. Other neuropathic symptoms include tingling in his fingers and hands. The patient denies retinopathy and has no known cardiovascular disease. A recent urinalysis showed excess amounts of albumin suggesting the possibility of early diabetic nephropathy....
>
> Other health problems include osteoarthritis in his right hip that has been particularly painful and has required narcotic of analgesic medications.

(Tr. at 185.)[8] The ALJ did not contact Dr. Jochen to clarify the onset of plaintiff's disability or whether the doctor believed plaintiff could return to work as an attorney as that job is normally performed.

On October 19, 2001, Dr. Reddy saw plaintiff for a disability assessment.[9] Dr. Reddy noted that plaintiff's major complaints were burning and pain in both legs and feet, as well as an ulcer on the left big toe with a history of trauma to both big toes. He also reported fracture of the right fibula, numbness in both arms, and arthritis of the hips. He stated that physical activities aggravated his symptoms and he used a cane from time to time. He stated that he had given up recreational activities such as golf and racquetball since the mid–90s. He stated that he had not been able to work for the past seven months because of continued pain and limitations. (Tr. at 397.)

Dr. Reddy stated that plaintiff had initially been injured on 12/29/00 when he slipped and fell on ice in a parking lot while counseling a client.[10] He also slipped and fell outside his office on 2/25/01, losing the tip of his left big toe and sustaining a right fibular fracture.[11] He

8. In a May 23, 2001 note Dr. Jochen indicated that plaintiff "has had advance neuropathic symptoms in both feet for approximately 8 years." (Tr. at 189.)

9. It appears that plaintiff filed a worker's compensation claim related to falls outside his office on 12/29/00 and 2/25/01. (Tr. at 397.)

10. A doctor at the Medical College of Wisconsin evaluated plaintiff regarding this injury on January 5, 2001. (Tr. at 457.) On examination, Dr. Luy found cellulitis of the left big toe and probable infection. He treated the toe with Augmentin, and stated that plaintiff may need an evaluation for possible amputation in the future. (Tr. at 450.) When plaintiff returned to Dr. Luy on January 19, 2001, his toe had improved, and Dr. Luy did not recommend amputation. (Tr. at 458.) The cellulitis resolved by February 8, 2001. (Tr. at 460.)

11. The record indicates that a doctor at Froedert Memorial Hospital saw plaintiff for this injury. (Tr. at 181.) The accompanying notes indicate that plaintiff suffered from peripheral neuropthy and insulin dependent dia-

was immobilized for five months. He subsequently developed a blister on the right big toe, which ultimately ruptured. (Tr. at 397.) Dr. Reddy noted that plaintiff had been diagnosed with diabetes in 1988 and subsequently with peripheral neuropathy due to diabetes mellitus. (Tr. at 398.)

Dr. Reddy considered plaintiff's pain to have resulted from peripheral neuropathy and thought that the injuries to his toes compounded his condition. "Functionally, it is evident that he is able to utilize his skills as an attorney to perform light/sedentary tasks primarily at a desk. However, given the use of various medication for chronic pain, his ability to work in a highly competitive manner is somewhat compromised." (Tr. at 400.)

On April 7, 2002, treating physician Dr. Luy prepared a diabetes RFC questionnaire for the SSA. He diagnosed plaintiff with diabetes with chronic toe ulcer and neuropathy in the hands and legs, and stated that his prognosis was "poor." (Tr. at 219.) He opined that plaintiff could do no lifting and carrying, and had significant limitations in repetitive reaching, handling and fingering. (Tr. at 220.) He stated that plaintiff had good days and bad days, and would likely be absent from work more than four times per month. (Tr. at 221.)[12] The form gave no onset date and the ALJ did not re-contact the doctor to obtain one.

On June 8, 2002, Dr. Galvani also prepared a questionnaire for the SSA. He indicated that he had infrequent contact with plaintiff from 1991 to 1995, and monthly contact from February 2002 to the present. His diagnosis was diabetes with peripheral vascular and neurologic complications, and degenerative changes of the hips, lumbar spine and hands. He stated that plaintiff had open skin ulcers on his feet with chronic infection, marked decreased light touch, and marked deficit in hands and feet proprioception. (Tr. at 194.) He indicated that plaintiff felt constant pain sufficient to interfere with attention and concentration, making him incapable of even low stress work. He stated that plaintiff had severe disturbance in reasoning and time perception, and severe fatigue and impairment in memory and concentration. He opined that plaintiff could not walk any distance, could sit for twenty minutes, and stand for fifteen minutes. (Tr. at 195.) He concluded that plaintiff was completely unable to work. (Tr. at 196–98.) This form report also contains no onset date for plaintiff's disability, and the ALJ did not seek clarification from the doctor at the hearing or thereafter.

### v. Conclusion as to Development of the Record

For three reasons, I conclude that the Commissioner has failed to show that the ALJ fully developed the record. First and most importantly, the ALJ failed to clarify the onset date of plaintiff's disability with Dr. Galvani. Instead, her questioning focused on plaintiff's current condition, and she did not advise the doctor of the importance of the issue. Had plaintiff been

---

betes mellitus, with a history of bilateral distal hallux ulceration, and used percocet. (Tr. at 175, 181.) On June 4, 2001, plaintiff was seen at the Medical College of Wisconsin pain management center. The note indicated that plaintiff had been a diabetic since 1988 and in January 2001 started having burning pain in his feet that got progressively worse. (Tr. at 505.) Plaintiff underwent a psychiatric evaluation at the pain center on August 15, 2001.

He related his severe pain to the falls he experienced in 2000 and 2001, but stated that he was "first disabled in December 1997 and had Dr. Jocken (sic) write a letter to social security on his behalf at that time." (Tr. at 516.)

12. There appear to be pages missing from this report.

represented, this defect would likely have been remedied.[13]

Second, the ALJ failed to re-contact the other treating physicians to determine the onset date. Under 20 C.F.R. § 404.1512(e) and SSR 96–5p, the ALJ is obligated to obtain clarification if the treating source opinion contains insufficient information on which to rule. *E.g., Bowman v. Barnhart*, 310 F.3d 1080, 1085 (8th Cir. 2002); *Carr v. Apfel*, No. C 00–02537, 2003 WL 132534 at * 2, 2003 U.S. Dist. LEXIS 512, at *8 (N.D.Cal. Jan. 9, 2003); *Shepard v. Massanari*, No. 01–0953, 2002 WL 31190917, at *4–5, 2002 U.S. Dist. LEXIS 21891, at *13–15 (E.D.La. Aug. 15, 2002); *see also Rosado v. Barnhart*, 290 F.Supp.2d 431, 440–41 (S.D.N.Y.2003). In the present case, Dr. Jochen stated (in July 2001) that plaintiff had been unable to perform his usual occupation for the past four years. The ALJ failed to address this opinion, an error I address later. Moreover, she failed to re-contact him to clarify the precise date of plaintiff's disability and whether plaintiff was disabled from legal work in general or just plaintiff's past work, which required extensive travel. *See* SSR 96–8p ("When it is found that an individual cannot do past relevant work as he or she actually performed it, the adjudicator must consider whether the individual can do the work as it is generally performed in the national economy."). Dr. Luy prepared a report indicating that plaintiff was currently disabled, but offered no opinion as to plaintiff's condition prior to December 31, 1997. It may be that, because he did not treat plaintiff at that time, Dr. Luy will be unable to do so. However, on the state of the record I cannot make that determination.

Third, the absence of physician notes from FHP suggests that the medical record during the relevant time period is incomplete. It is highly unlikely that plaintiff was able to obtain x-rays and lab work without having contact with a treating physician. The Commissioner has not shown that the ALJ attempted to obtain these records or that they no longer exist.[14]

The Commissioner argues that plaintiff has not presented any new evidence that the ALJ failed to obtain. However, the Commissioner's

> argument has it backwards. When a claimant's waiver of counsel is invalid, the burden of showing that the record has been fully developed shifts to the Commissioner. The Commissioner cannot fulfill that burden by arguing that the claimant has not brought forth "missing evidence." *Young v. Apfel*, No. 98–CV–206, 1999 WL 325026, at *9, 1999 U.S. Dist. LEXIS 7616, at *28 (N.D.Ind. May 19, 1999). The plaintiff need only present such evidence after the Commissioner has met her burden. *Binion*, 13 F.3d at 245. The Commissioner has not done so here.

*Henderson*, 205 F.Supp.2d at 1011.

The Commissioner also notes that the record in the present case is large and the hearing lengthy. However, most of the medical evidence post-dates the relevant time period. Further, the hearing may have been a bit longer than the norm, but as discussed above, the ALJ failed to focus on the proper issue. It is the substance of the record that matters, not the size.

Finally, the Commissioner notes: "The simple fact is that Plaintiff essentially received no treatment for his condition until

---

**13.** As noted above, the ALJ's questioning of plaintiff and his wife also focused primarily on the present, though they nevertheless provided some relevant testimony.

**14.** It may be that additional records will be found in plaintiff's SSI file, which the ALJ failed to obtain. In fact, it appears that she was unaware that plaintiff was receiving SSI at the time of the hearing.

well after the expiration of his December 1997 date last insured. Plaintiff's argument that the ALJ failed to fully develop the record should therefore by rejected." (Def. Brf. at 9.) However, this argument ignores the fact that contemporaneous medical evidence is not necessary to prove disability. *See Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir.1998) (stating that what is required is contemporaneous corroboration of the disability, "not necessarily contemporaneous medical corroboration"). Plaintiff's treating physicians could have filled the gap and provided a retrospective diagnosis, had they been asked to do so. They were not.

Therefore, I conclude that the ALJ failed to fully and fairly develop the record in the absence of counsel. The matter must accordingly be remanded for re-hearing.[15]

## B. Credibility Determination

### 1. Legal Standard

▮▮▮ Generally, the court must defer to the ALJ's credibility determination because she had the opportunity to personally observe the claimant's demeanor at the hearing. *Windus v. Barnhart*, 345 F.Supp.2d 928, 945 (E.D.Wis.2004). Thus, the court will ordinarily reverse an ALJ's credibility determination only if it is "patently wrong." *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir.2003). "However, when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations, appellate courts have greater freedom to review the ALJ's decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994). Further, the ALJ must comply with SSR 96–7p in evaluating credibility. *Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir.2003); *Brindisi*

*v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).

SSR 96–7p establishes a two step process for evaluating symptoms, such as pain, fatigue or weakness. First, the ALJ must consider whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. If there is no medically determinable physical or mental impairment, or if such impairment could not reasonably be expected to produce the claimant's pain or other symptoms, the symptoms cannot be found to affect the claimant's ability to do basic work activities. SSR 96–7p.

▮▮▮ Second, if an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to perform basic work activities. If the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96–7p.

At step two, "the ALJ may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir.1995). Rather, this is but one factor to consider, along with:

(a) the claimant's daily activities;

---

**15.** Plaintiff notes that he provided to the Appeals Council affidavits from additional witnesses supporting his claim. (Tr. at 523–29.) This is likely the sort of evidence an attorney would have obtained, though I cannot fault the ALJ for not developing it.

(b) the location, duration, frequency and intensity of the pain;

(c) precipitating and aggravating factors;

(d) type, dosage, effectiveness and side effects of medication;

(e) treatment other than medication;

(f) any measures the claimant has used to relieve the pain or other symptoms; and,

(g) functional limitations and restrictions.

*Id.* (citing 20 C.F.R. § 404.1529(c)(3)); *see also* SSR 96–7p (stating that the relevant considerations include the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms).

■ While SSR 96–7p does not require the ALJ to analyze and elaborate on each of these seven factors when making a credibility determination, the ALJ must sufficiently articulate her assessment of the evidence to assure the court that she considered the important evidence and to enable the court to trace the path of her reasoning. *Windus*, 345 F.Supp.2d at 946. In this regard, SSR 96–7p requires the ALJ's decision to include "specific reasons for the finding on credibility, supported by the evidence in the case record." "[N]othing in Social Security Ruling 96–7p suggests that the reasons for a credibility

finding may be implied. Indeed, the cases make clear that the ALJ must specify the reasons for [her] finding so that the applicant and subsequent reviewers will have a fair sense of the weight given to the applicant's testimony." *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir.2003).

## 2. Analysis

■ In the present case, the ALJ found that plaintiff was "not credible to the degree that he [alleged] that he could [not] perform his past relevant job as an attorney as of the date last insured." (Tr. at 18.) She provided no explicit reason for this finding, contrary to SSR 96–7p and *Golembiewski*. Principles of administrative law preclude the court from inferring a reason for the ALJ's credibility determination or finding that the ALJ's discussion of the evidence implicitly supplies reasons for rejecting the claimant's testimony. *Windus*, 345 F.Supp.2d at 946. Thus, her finding cannot stand.

■ Even if I could properly infer a rationale for the ALJ, her finding could not stand.[16] It appears that the ALJ may have rejected plaintiff's testimony because the medical records prior to December 31, 1997, do not show foot ulcers; complaints of neuropathy, parasthesias, or excessive pain; prescribed narcotic medications; or mental limitations. (Tr. at 17.) However, as noted, if the ALJ finds a medically determinable impairment that could produce symptoms, she may not reject the claimant's testimony solely because it is not "fully supported by objective medical evidence." *Knight*, 55 F.3d at 314. The ALJ found that plaintiff had severe impairments prior to December 31, 1997— degenerative disc disease and diabetes. (Tr. at 17.) She did not find or infer that

---

**16.** Thus, her failure to comply with SSR 96–7p was more than technical and cannot be considered harmless. *See Keys v. Barnhart*,

347 F.3d 990, 994–95 (7th Cir.2003) (applying harmless error review to ALJ's decision).

these conditions could not produce the pain or other symptoms that plaintiff reported. Rather, she based her finding on the absence of medical corroboration of plaintiff's testimony. Because plaintiff's testimony did not require medical corroboration, her finding was in error.

Moreover, the ALJ ignored contemporaneous medical evidence supporting plaintiff's claim. In May 1989, plaintiff experienced arm numbness, possibly an early indication of developing neuropathy. (Tr. at 125, 263.) In April 1991, he was treated for diabetes and noted to have double vision and problems with his feet and legs. (Tr. at 125.) Dr. Galvani testified that he treated plaintiff's foot ulcers with ointment in 1994.[17] (Tr. at 585–86.) The record also shows that plaintiff obtained prescriptions for Penicillin in 1995. (Tr. at 199.) The ALJ must consider this evidence on remand. The ALJ must also ensure that the medical record is complete. As noted above, it appears that FHP records from the 1990s are missing from the file. Further, on remand the ALJ must consider all of the relevant factors under SSR 96–7p, not just the medical evidence (or lack thereof). Finally, the ALJ must on remand direct questions to plaintiff, his wife, and any other witnesses that focus the testimony on the relevant period of time.

## C. Hypothetical Question

### 1. Legal Standard

 "If the ALJ relies on testimony from a vocational expert, the hypothetical question [s]he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto v. Barnhart,* 374 F.3d 470, 474 (7th Cir.2004). "The reason for the rule is to ensure that the vocational expert does not refer to jobs that the applicant cannot work because the expert did not know the full range of the applicant's limitations." *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir.2002). However, this does not mean that every limitation alleged by the claimant must be included—only those supported by the evidence. *See Ehrhart v. Sec'y of HHS,* 969 F.2d 534, 540 (7th Cir. 1992).

### 2. Analysis

At plaintiff's hearing, the ALJ asked one hypothetical question, concerning a person 62 years old, with plaintiff's education and vocational history, capable of medium work with no climbing, balancing, heights, hazards, kneeling or crawling, and occasional stooping and crouching. The VE answered that such a person could perform plaintiff's past work. (Tr. at 599.)[18]

---

**17.** The Commissioner notes that Dr. Galvani did not provide treatment notes from the relevant time period and argues that his testimony regarding plaintiff's condition during that time is alone insufficient to prove disability. The Commissioner is wrong. As the Seventh Circuit has noted, even a physician who did not treat the claimant during the relevant time (as Dr. Galvani did), may offer a retrospective diagnosis of disability. Further, while the claimant must produce contemporaneous corroboration of the disability, it need not necessarily be contemporaneous *medical* corroboration. Testimony will do, and in the present case, plaintiff, his wife, and others have provided such testimony. *See Wilder,* 153 F.3d at 802; *see also* SSR 83–20 (stating that medical evidence alone may not always be sufficient to establish onset date and in such cases it may be necessary to explore other sources of documentation such as family members, friends or former employers).

**18.** Plaintiff asked the VE about a lawyer who specialized in medical malpractice defense work and had the work taken away by the client because of non-performance. (Tr. at 600.) Describing the question as circular, the VE replied that if the person had work taken away because he was not capable of doing it then he would not be capable of performing the job. But if the client took the work away for other reasons and the person retained the cognitive ability to do the work then the person could perform the job. (Tr. at 600–01.)

Plaintiff contends that the ALJ's hypothetical did not mention the side effects of his medication and the resulting mental impairment. However, it is unclear whether plaintiff experienced those effects during the relevant time period. Plaintiff testified that he took over-the-counter medicine in December 1997. (Tr. at 572.) He mentioned that he received more powerful medication from Dr. Galvani but did not say when he started using it, and his testimony concerning his mental status appeared to concern his present condition. Likewise, the testimony of Dr. Galvani did not clearly demonstrate harmful side effects during the relevant time period.[19] Therefore, based on the record as it stands, I cannot say that the hypothetical question was flawed.

However, this brings us back to plaintiff's first allegation—that the ALJ failed to fully develop the record by ensuring that the testimony focused on the relevant time period. Had the ALJ properly focused the testimony, evidence pertaining to the side effects of medication and resulting mental impairment during the relevant time period may have been developed. Therefore, on remand, the ALJ must fully develop the record and propound a hypothetical question that incorporates all impairments supported by the evidence.

## D. Evaluation of and Ability to Perform Past Work

### 1. Legal Standard

At step four the ALJ must determine whether the claimant has the RFC to perform his past work. This determination is comprised of three phases. *Gotz v. Barnhart,* 207 F.Supp.2d 886, 896 (E.D.Wis. 2002).

First, the ALJ must evaluate the claimant's RFC. The RFC determination is a function-by-function assessment of the claimant's ability to perform work-related activities. At step 4 of the sequential evaluation process, RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past work as he or she actually performed it. Thus, the ALJ must separately assess the claimant's ability to perform each of seven strength demands: sitting, standing, walking, lifting, carrying, pushing and pulling. The ALJ must also determine whether the claimant can work on a regular and continuing basis, i.e. eight hours a day, five days a week, or an equivalent work schedule. *Id.* (citing SSR 96–8p).

Second, the ALJ must determine the physical and mental demands of the claimant's past work. Past work can mean two things: (1) the actual functional demands of the particular job that the claimant performed, or (2) the functional demands and job duties of such an occupation as it is generally found in the national economy. *Id.*

Third, the ALJ must determine whether the claimant has the ability to meet the job demands found in phase two despite the mental or physical limitations found in phase one. This involves comparing the claimant's past relevant work with his present mental and physical capacity. Additionally, to justify a finding that the claimant is able to return to his past relevant work the record must establish that he could do so on a sustained basis. *Id.* In making this determination the ALJ cannot

---

**19.** Mrs. Blom provided some testimony as to plaintiff's demeanor at work in the early 90s. (Tr. at 594.) However, aside from noting that her testimony "essentially was consistent" with plaintiff's as to his current condition (Tr. at 17), the ALJ failed to address her statements.

simply describe a claimant's job in a generic way, e.g. "sedentary" or "light," and "conclude, on the basis of the claimant's residual capacity, that [he] can return to [his] previous work. Instead, the ALJ must list the specific physical requirements of the previous job and assess, in light of the available evidence, the claimant's ability to perform these tasks." *Nolen v. Sullivan*, 939 F.2d 516, 518 (7th Cir.1991) (citing *Strittmatter v. Schweiker*, 729 F.2d 507, 509 (7th Cir.1984)).

## 2. Analysis

▮▮▮ In the present case, the ALJ determined that as of his date last insured plaintiff had the RFC to perform medium work. Relying on the VE's testimony, she then found that in light of that RFC plaintiff could perform his past relevant work as an attorney prior to his date last insured. (Tr. at 18.) The ALJ failed to analyze plaintiff's RFC on a function-by-function basis or the specific demands of his past work, either as he did it or as it is generally done, and she expressed her step four finding in a manner essentially the same as that condemned in *Nolen*.

The Commissioner argues that because plaintiff failed to present evidence that he was unable to perform his past work as it is generally performed the ALJ did not have to analyze each and every function of his past work. She notes that even though plaintiff testified that as he did it his past work was highly specialized and required a great deal of travel, he failed to demonstrate that he could not work as an attorney, as that job is generally done, prior to December 31, 1997.

The Commissioner's argument appears to be that the ALJ's failure to comply with SSR 96–8p and *Nolen* is, under the circumstances, harmless error.[20] I cannot agree. Although plaintiff argued that he could not perform his past work due to its travel demands and many attorney positions in the national economy do not require extensive travel, plaintiff also presented evidence that he could not meet the mental demands of legal work. Moreover, it appears undisputed that plaintiff is now and has for years been mentally incapable of working as a lawyer. As discussed above, the ALJ failed to properly develop the record on this issue regarding the relevant time period.[21] Therefore, the matter must be remanded on this basis as well.

## E. Treating Source Statements

### 1. Legal Standard

▮▮▮ Opinions from the claimant's treating physician (a/k/a "treating source") are entitled to special consideration in social security cases. *Dominguese v. Massanari*, 172 F.Supp.2d 1087, 1100 (E.D.Wis.2001). If the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence the ALJ must afford it "controlling weight." 20 C.F.R. § 404.1527(d)(2). Even if the ALJ finds that the treating source opinion is not entitled to controlling weight, she may not simply reject it. SSR 96–2p. Rather, she must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and

**20.** I assume that this is the Commissioner's argument and that she is not suggesting that ALJs may short-cut the step four analysis whenever they conclude that the evidence is lacking. *See* SSR 96–8p (stating that failure to make a function-by-function assessment could result in the ALJ overlooking some limitation or restriction).

**21.** Contrary to the Commissioner's argument, plaintiff did not base this assertion solely on his own testimony. His wife and Dr. Galvani both testified as to his diminished judgement and mental ability.

physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d). "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96–2p. "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision." *Wates v. Barnhart*, 274 F.Supp.2d 1024, 1034 (E.D.Wis.2003) (quoting 20 C.F.R. § 404.1527(d)(2)). Finally, as noted, in some cases the ALJ may be required to re-contact the treating source if the report contains insufficient information for the ALJ to determine whether the claimant is disabled. 20 C.F.R. § 404.1512(e); SSR 96–5p.

### 2. Analysis

The ALJ discussed Dr. Galvani's testimony but not his written report.[22] Nor did she discuss the reports of Drs. Luy and Jochen. Given their prominence in social security proceedings, it is difficult to see how ignoring a treating source report can ever be reasonable. *See, e.g., Samuel v. Barnhart*, 295 F.Supp.2d 926, 946 (E.D.Wis.2003).

Nevertheless, the Commissioner notes that Drs. Jochen and Luy did not examine plaintiff until years after his insured status expired, and that there are no treatment notes from any of the treating sources from the relevant time period. She contends that because these reports pertained to plaintiff's condition in 2001 or thereafter, they are irrelevant, and the ALJ justifiably disregarded them.

The first problem with this argument is that the ALJ did not make it. "[P]rinciples of administrative law require the ALJ to rationally articulate the grounds for her decision and confine [judicial] review to the reasons supplied by the ALJ." *Steele*, 290 F.3d at 941. "That is why the ALJ (not the Commissioner's lawyers) must 'build an accurate and logical bridge from the evidence to her conclusion.'" *Id.* (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir.2001)). Perhaps the ALJ did reject the reports for this reason, but without so indicating in her decision I am not free to speculate. *See Zblewski v. Schweiker*, 732 F.2d 75, 79 (7th Cir.1984) (stating that unless the ALJ articulates reasons the reviewing court cannot tell if she rejected evidence or simply ignored it).

In the alternative, the Commissioner argues that remand on this basis would serve no useful purpose because the ALJ was not required to give any weight to reports that post-date plaintiff's insured status. For three reasons, I disagree.

First, the Seventh Circuit has held: "There can be no doubt that medical evidence from a time subsequent to a certain period is relevant to a determination of a claimant's condition during that period." *Halvorsen*, 743 F.2d at 1225. "Any other rule would restrict unduly the availability of benefits under the Act." *Id.* Therefore, the ALJ must consider evidence that postdates the relevant period to the extent that it corroborates or supports the evidence from the relevant period.

Second, Dr. Jochen did discuss the relevant time period. He indicated that plaintiff "had advance neuropathic symptoms in both feet for approximately 8 years," (Tr. at 189) and that plaintiff had "been unable

---

**22.** In this regard, the ALJ stated that Dr. Galvani was "less certain" about plaintiff's condition prior to December 31, 1997, and

"deferred" to the treatment records from that time. I found no testimony supporting this assertion.

to perform his usual occupation for the past 4 years." (Tr. at 186.) As noted, it is permissible for a physician to make a retrospective diagnosis, even though he did not treat the claimant during the relevant time period. *See Martinez*, 242 F.Supp.2d at 377 ("The retrospective opinion of a doctor who is currently treating a claimant is entitled to significant weight even though the doctor did not treat the claimant during the relevant period.") (internal quote marks omitted).

Third, to the extent that the treating sources failed to offer an opinion on plaintiff's onset date, the ALJ had an obligation to re-contact them. *See* SSR 96–5p. On remand, she must do so.[23]

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **REVERSED**, and the matter is **REMANDED** for further proceedings consistent with this decision pursuant to § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

---

**23.** Though the parties do not address it, as discussed above, the record also contains a report from Dr. Reddy addressing plaintiff's claim of disability.